Filed 5/17/18

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)           S235556
      v. )
)       Ct.App. 5 F068737
FELIZ CORRAL RUIZ II, )
)       Tulare County
      Defendant and Appellant. )   Super. Ct. No. VCF241607J
_____ )

      We granted review in this case to determine whether imposing a criminal laboratory analysis fee (Health & Saf. Code, § 11372.5, subd. (a)) and a drug program fee (Health & Saf. Code, § 11372.7, subd. (a)) is appropriate for a conviction of conspiracy to transport a controlled substance in violation of Health and Safety Code, section 11379, subdivision (a).[1] The Court of Appeal answered this question in the affirmative based on Penal Code section 182, subdivision (a), which provides in relevant part that persons convicted of conspiring to commit a felony "shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony." In light of this provision, the court reasoned, because these fees must be imposed for a conviction of transporting a controlled substance, they must also be imposed for a conviction of conspiracy to transport a controlled substance. We agree with the Court of Appeal and affirm.

---

[1]    All further unlabeled statutory references are to the Health and Safety Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to judicially authorized wiretapping, law enforcement officers heard defendant Feliz Corral Ruiz II, who is a member of a Norteño street gang, conspiring to shoot and kill members of another gang in retaliation for the shooting of a Norteño gang member. On July 28, 2012, several Norteño gang members shot at an apartment complex where members of the other gang were known to gather, hitting one person in the chest and another in the leg. In connection with these events, the People filed an information charging defendant with, among other crimes, conspiracy to transport a controlled substance in violation of section 11379, subdivision (a). Pursuant to a plea agreement, defendant pleaded no contest to this charge. As part of his sentence, the court imposed a $50 "criminal laboratory analysis fee" pursuant to section 11372.5, subdivision (a), and a $100 "drug program fee" pursuant to section 11372.7, subdivision (a).

On appeal, defendant argued that these fees were "unauthorized" — and should therefore be stricken — because: (1) he was convicted, not of a drug offense specified in the statutes establishing the fees, but of *conspiracy* to commit one of the specified offenses; and (2) the fees are not "punishment" for purposes of the conspiracy sentencing statute — Penal Code section 182, subdivision (a) — which provides that persons convicted of conspiring to commit a felony "shall be punishable in the same manner and to the same extent as is provided for the *punishment* of that felony." (Italics added.) The Court of Appeal disagreed, concluding that the fees constitute "punishment" within the meaning of Penal Code section 182, subdivision (a). We granted defendant's petition for review to consider this conclusion.[2]

---

[2] In addition to rejecting defendant's claim on the merits, the Court of Appeal concluded that defendant had forfeited his claim by failing to object in the trial court to the fees' imposition. However, because defendant contends the fees

*(footnote continued on next page)*

2

Section 11372.5, subdivision (a), establishes a $50 "criminal laboratory analysis fee" for persons "convicted of a violation of" specified statutes relating to drugs, including section 11379. Section 11372.7, subdivision (a), establishes a "drug program fee," not to exceed $150, for persons "convicted of a violation of" chapter 6 of division 10 of the Health and Safety Code, which includes section 11379. However, defendant was convicted, not of violating section 11379, but of *conspiring* to violate that statute, in violation of Penal Code section 182, subdivision (a)(1), which makes it a crime for persons to "conspire" to "commit any crime." Because, as defendant argues and the People concede, neither fee statute refers to persons convicted of conspiracy to commit a crime, neither statute alone authorizes imposition of a fee for defendant's conspiracy conviction.

Instead, the parties, like the Court of Appeal, focus on the sanctions provision of the conspiracy statute, which states in relevant part that persons convicted of conspiring to commit a felony "shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony." (Pen. Code, § 182, subd. (a).) Based on this language, the Court of Appeal reasoned that the dispositive question is whether the fees at issue "constitute[] 'punishment,' " and it concluded that each fee *does* constitute "punishment." Defendant agrees with the court's statement of the dispositive question — whether the fees constitute punishment — but he disagrees with the court's answer, arguing that the charges constitute, not punishment, but "nonpunitive administrative fee[s] . . . used to offset the costs of drug and crime labs." In response, the People first assert, quoting from our decision in *People v. Athar* (2005) 36 Cal.4th 396 (*Athar*), that because Penal Code section 182, subdivision

---

are "unauthorized" — i.e., as a matter of law, they may not be imposed for his conspiracy conviction — his failure to object below does not constitute a forfeiture. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [claim that sentence is "unauthorized . . . may be raised for the first time on appeal"].)

(a), " 'requires sentencing to the same extent as the underlying target offense,' " the trial court properly imposed the fees "regardless of [their] nature" and whether they are "punitive is irrelevant." The People alternatively assert that, "[e]ven if characterization of the fees is" relevant, both fees "constitute punishment" and were thus "properly imposed."

In evaluating these opposing positions, our "fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040; see also Pen. Code, § 4 [provisions of Penal Code "are to be construed according to the fair import of their terms, with a view to effect [the Penal Code's] objects and to promote justice"].) "If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1107.)

Insofar as the People appear to assert that it is irrelevant whether the fees constitute punishment, their argument runs afoul of these rules of statutory construction. As noted above, subdivision (a) of Penal Code section 182 states in relevant part that persons convicted of conspiring to commit a felony "shall be punishable in the same manner and to the same extent as is provided for *the punishment* of that felony." (Italics added.) The plain meaning of this language appears to establish that a consequence prescribed for the offense a defendant conspired to commit — the underlying target offense — may be imposed for a conspiracy conviction only if that consequence constitutes part of "the punishment" for the underlying target offense. (*Ibid.*) Thus, under the plain language of Penal Code section 182, subdivision (a), whether the trial court

properly imposed the fees at issue here depends on whether they are part of "the punishment" for the offense that defendant was convicted of conspiring to commit. (See *People v. Hernandez* (2003) 30 Cal.4th 835, 865 ["Because" Pen. Code, § 182 "refers generally to the punishment prescribed for murder in the first degree, it incorporates whatever punishment the law prescribed for first degree murder when the conspiracy was committed"]; *In re Romano* (1966) 64 Cal.2d 826, 829 ["punishment for conspiracy to commit a felony is the same as the punishment for the felony itself"]; *People v. Superior Court* (*Kirby*) (2003) 114 Cal.App.4th 102, 105 [language of Pen. Code, § 182 "leads us to the statutes that . . . set forth the applicable punishments for" the underlying target offense].) The People point to no ambiguity in the statutory language or anything in the legislative history that undermines this plain meaning construction.

Instead, as noted above, the People rely on our decision in *Athar*, but that decision does not support their argument. There, we held that sentence enhancements prescribed for a money laundering conviction apply to offenders convicted of conspiring to commit money laundering. (*Athar*, *supra*, 36 Cal.4th at p. 398.) As the People observe, toward the end of the opinion, we stated that Penal Code section 182 "requires sentencing to the same extent as the underlying target offense." (*Id*. at p. 406.) However, we made this statement in the context of endorsing *People v. Villela* (1994) 25 Cal.App.4th 54 insofar as it looked to whether a prescribed consequence for the underlying target offense "was a punishment" to determine if Penal Code section 182 required imposition of that consequence for conspiring to commit that offense. (*Athar*, at p. 406.) Moreover, earlier in the opinion, in rejecting the argument that Penal Code section 182 authorizes imposition only of "the base term" for the underlying target offense, we explained: "The statute specifically refers to the 'punishment of that felony' [citation] and thus includes all *punishment* for money laundering, including enhancements." (*Id*. at p. 405, italics added.) Notably, the defendant in *Athar* conceded that the sentence enhancement there at issue constituted "enhanced

5

punishment" for the underlying target offense (*id*. at p. 404), so the case presented no question as to whether the statute extends further to include consequences of the underlying target offense that do not constitute punishment.  For these reasons, *Athar* does not support the view that whether a consequence constitutes punishment is irrelevant to whether Penal Code section 182 requires imposition of that consequence for a conspiracy conviction.

In light of the preceding, the question here is whether the fees at issue are part of "the punishment" "provided for" the underlying target felony — transporting a controlled substance in violation of section 11379, subdivision (a) — as those terms are used in Penal Code section 182, subdivision (a). Unfortunately, the conspiracy statute itself provides no definition of the term "punishment."  Nor have we found anything in the relevant legislative history elucidating the statute's use of the term.

Regarding the term's ordinary meaning, we have observed that "[c]ommonly understood definitions of punishment are intuitive:  there is little dispute that additional jail time or extra fines are punishment.  [Citation.] However, punishment has historically included a variety of methods limited only by human imagination . . . ." (*People v. McVickers* (1992) 4 Cal.4th 81, 84.) Dictionaries have typically defined the term broadly to include any " 'pain, suffering, loss, confinement or other penalty inflicted on a person for a crime or offense, by the authority to which the offender is subject.' " (*Gunning v. People* (1899) 86 Ill.App. 174, 178.)  Similarly, "[a]s a legal term of art, 'punishment' has always meant a 'fine, penalty, or confinement inflicted upon a person by the authority of the law and the judgment and sentence of a court, for some crime or offense committed by him.' " (*Helling v. McKinney* (1993) 509 U.S. 25, 38 (dis. opn. of Thomas, J), quoting Black's Law Dict. (6th ed. 1990) p. 1234.)

"[T]he traditional aims of punishment" are "retribution or deterrence." (*People v. Alford* (2007) 42 Cal.4th 749, 759.)  However, a sanction does not constitute punishment merely because it has some "deterrent or retributive *effect*."

6

(*In re Alva* (2004) 33 Cal.4th 254, 286 (*Alva*).) As we have explained in the context of applying the state and federal protections against cruel and/or unusual punishments, "a sanction designed and intended only to serve legitimate nonpenal objectives is not punishment . . . simply because it may burden, inconvenience, restrict, or deter *in fact*." (*Ibid*.) On the other hand, that a given sanction may "serve[] remedial purposes" does not establish that it is not "punishment." (*Austin v. United States* (1993) 509 U.S. 602, 610 [applying the Eighth Amendment]; see *People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1350 ["Even assuming a fine serves *some* remedial purpose, it will be considered punishment [for purposes of applying the Eighth Amendment] if it *also* serves either retributive or deterrent purposes"].) In short, because "sanctions frequently serve more than one purpose" (*Austin*, at p. 610) and have multiple effects, determining whether a given sanction constitutes "punishment" is often difficult. (Cf. *People v. One 1950 Cadillac Club Coupe* (1955) 133 Cal.App.2d 311, 318 ["Practically no civil sanction is entirely remedial or entirely intended as a punishment"].)

"[T]he method" courts use to determine "what constitutes punishment varies depending upon the context in which the question arises. But two factors appear important in each case: whether the Legislature intended the provision to constitute punishment and, if not, whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent." (*People v. Castellanos* (1999) 21 Cal.4th 785, 795 (plur. opn. of George, C.J.).) The first factor is generally considered determinative where a court concludes that the Legislature did, in fact, intend the particular sanction to constitute punishment. As we recently explained in the context of applying the constitutional right to a jury trial, "[a]t the outset, . . . the inquiry is whether the state legislative authority, in adopting a law allowing a court to impose [a sanction], intended [it] as punishment, or instead meant to adopt a nonpunitive regulatory scheme. [¶] . . . '[I]f the intention . . . was to impose punishment, that

7

ends the inquiry.' " (*People v. Mosley* (2015) 60 Cal.4th 1044, 1063 (*Mosley*); see *People v. Alford*, *supra*, 42 Cal.4th at p. 755 [stating, in the context of applying prohibitions against ex post facto laws, " 'If the intention of the legislature was to impose punishment, that ends the inquiry' "].) In determining whether the Legislature had an "intent to impose punishment" in passing a statute, courts look to both the statute's "face" and "its legislative history." (*Alva, supra*, 33 Cal.4th at p. 266; see *Alford*, at p. 756 ["legislative history demonstrates that the court security fee was enacted . . . for [a] nonpunitive purpose"]; see also *United States v. Brown* (1965) 381 U.S. 437, 476 (dis. opn. of White, J.) ["a punitive purpose has been found when such a purpose clearly appeared in the legislative history"]; *Nixon v. Administrator of General Services* (1977) 433 U.S. 425, 478 (*Nixon*) [a "recognized test of punishment is strictly a motivational one: inquiring whether the legislative record evinces a congressional intent to punish"]; *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 169 ["[a] study of the history of" the statute's "predecessor," "coupled with a reading of Congress' reasons for enacting" the statute, "compels a conclusion that the statute's primary function is to serve as an additional penalty"].)

Consistent with these principles, defendant focuses in his briefs on the Legislature's intent in passing sections 11372.5 and 11372.7. He argues that the Legislature's "clearly discernible . . . intent" is that the fees in question "are not 'punishment.' " In support of his position, he emphasizes that both statutes use the term "fee" to describe their respective charges rather than the term "fine," "penalty," or "punishment." (§ 11372.5, subd. (a) ["criminal laboratory analysis fee"]; § 11372.7, subd. (a) ["drug program fee"].) But the Legislature's use of the term "fee" does not necessarily establish that a charge does not constitute "punishment." (See *People v. Graves* (Ill. 2009) 919 N.E.2d 906, 909-910 ["charge labeled a fee by the legislature may be a fine, notwithstanding the words actually used by the legislature"]; *Mueller v. Raemisch* (7th Cir. 2014) 740 F.3d 1128, 1133 ["fine is a fine even if called a fee"]; *People v. Jones* (Ill. 2006) 861

8

N.E.2d 967, 985 [charge "is in fact a fine," "notwithstanding" that the statute calls it a " 'fee' "].)

Moreover, defendant's argument ignores the principle that, in determining a statute's purpose, we consider its language, not in isolation, but in the context of its "entire substance" and all of "its various parts." (*Alford v. Superior Court*, *supra*, 29 Cal.4th at p. 1040.) After setting forth the "criminal laboratory analysis fee" in the first sentence of section 11372.5, subdivision (a), the Legislature specified in the very next sentence that "[t]he court shall increase the total *fine* necessary to include *this increment*." (Italics added.) The next paragraph of the subdivision provides that, as to specified offenses "for which a fine is not authorized by other provisions of law, the court shall, upon conviction, impose *a fine* in an amount not to exceed fifty dollars ($50), which shall constitute the increment prescribed by this section and which shall be in addition to any other *penalty* prescribed by law." (*Ibid.*, italics added.) Reading the first sentence of the subdivision in the context of the rest of the subdivision, it appears that the Legislature understood and intended "the criminal laboratory analysis fee" to be a "fine" and a "penalty." (*Ibid.*) The same conclusion appears from the language of section 11372.7, subdivision (a), which sets forth the "drug program fee" in its first sentence and provides in its second sentence that "[t]he court shall increase the total *fine*, if necessary, to include this increment, which shall be in addition to any other *penalty* prescribed by law." (Italics added.) This language is significant because "fines" and "penalties" are commonly understood to be "punishment." (*People v. Alford*, *supra*, 42 Cal.4th at p. 757 ["[f]ines arising from convictions are generally considered punishment"]; *County of San Diego v. Milotz* (1956) 46 Cal.2d 761, 766 [" ' "penalty" ' " is "often used as synonymous with the word 'punishment' "]; *People v. High* (2004) 119 Cal.App.4th 1192, 1199 ["[t]he root word [of penalty], 'penal,' means 'of or relating to punishment or retribution,' " and dictionaries "define[] 'penalty' as '[a] punishment established by law or authority for a crime or offense' "]; *United States v. Reorganized CF&I*

9

*Fabricators of Utah, Inc.* (1996) 518 U.S. 213, 224 ["if the concept of penalty means anything, it means punishment for an unlawful act or omission"]; see *People v. Sharret* (2011) 191 Cal.App.4th 859, 869 [that statute refers to criminal laboratory analysis fee as "an increment of a fine" supports conclusion that the fee is punitive for purposes of applying Pen. Code, § 654].)

To the extent the statutory language leaves any uncertainty about the Legislature's intent, "the legislative record [further] evinces [an] intent to punish." (*Nixon*, *supra*, 433 U.S. at p. 478). The Legislature enacted section 11372.5 in 1980 by passing Senate Bill No. 1535. The 1980 version of the statute provided in subdivision (a) that every person convicted of a specified offense "shall, *as part of any fine imposed*, pay an increment in the amount of fifty dollars ($50) for each separate offense. The courts shall *increase the total fine as necessary to include this increment*. [¶] With respect to those offenses specified in this subdivision for which a fine is not authorized by other provisions of law, the court may upon conviction *impose a fine* in the amount of fifty dollars ($50), *which shall constitute the increment prescribed by this section* and which shall be *in addition to any other penalty* authorized by law." (Stats. 1980, ch. 1222, § 1, p. 4140, italics added.) This language made clear that the Legislature considered the $50 payment under the statute to be a "fine," which was to be "imposed" either "as part of" the offender's "total fine" or, as to specified offenses for which no fine was otherwise authorized by law, as a separate "fine . . . in addition to any other penalty authorized by law." (*Ibid.*)

The legislative history of the 1980 statute confirms this conclusion. The Legislative Counsel's Digest described the subject of Senate Bill No. 1535 as "Controlled substance offenses: *penalty assessments*," and then explained: "This bill would require every person who is convicted of prescribed controlled substance offenses to pay an additional $50 *as part of any fine imposed*; the total fine would be increased to include the increment. The bill would authorize $50 *fines* to be imposed for such purpose with respect to offenses *for which fines are*

10

*not presently authorized*.” (Legis. Counsel's Dig., Sen. Bill No. 1535 (1979–1980 Reg. Sess.) 4 Stats. 1980, Summary Dig., p. 401, italics added.) In a report to the Governor recommending that he sign the passed bill, the Health and Welfare Agency explained that the new statute would (1) require those convicted of specified controlled substance offenses to “be *fined* an additional $50,” (2) “authorize[] $50 *fines* to be assessed . . . if a fine is not authorized by other provisions of law,” and (3) generate revenue “through the assessment of additional *fines*.” (Health & Welf. Agency, Dept. of Alcohol & Drug Programs, Enrolled Bill Rep. on Sen. Bill No. 1535 (1979–1980 Reg. Sess.) Sept. 5, 1980, pp. 1-2, italics added.)[3] In another report to the Governor, the Department of Finance explained that the new statute would “provide[] for a special *penalty assessment* for controlled substance offenses.” (Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1535 (1979–1980 Reg. Sess.) Sept. 17, 1980, p. 1, italics added.) In a report recommending that the Governor consider a veto, the Department of Legal Affairs likewise explained that the statute “would impose a new, additional, $50 *penalty assessment*” on those convicted of the specified drug offenses, and then stated that it is “inappropriate to use criminal sanctions solely to raise revenue. *Fines* should be based upon the proper punishment for the crime committed, not the county's need for money.” (Governor's Office, Dept. of Legal Affairs, Enrolled Bill Rep. on Sen. Bill No. 1535 (1979–1980 Reg. Sess.) Sept. 23, 1980, p. 1.)[4]

---

[3] We have often found enrolled bill reports to be “ ‘instructive’ ” as to the Legislature's intent, purpose, and understanding in enacting a statute, because they are “generally prepared within days after” the statute's passage and are written by “governmental department[s] charged with informing the Governor about the [statute] so that he can decide whether to sign it, thereby completing the legislative process.” (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1219, fn. 3.)

[4] Early versions of the 1980 statute referred to the $50 payment as “a special financial penalty” to be “assessed” “in addition to any other penalty imposed.” (Sen. Bill No. 1535 (1979–1980 Reg. Sess.) as introduced Feb. 21, 1980, and as

*(footnote continued on next page)*

In resisting the conclusion that the Legislature intended the $50 assessment to constitute punishment, defendant relies heavily on the Legislature's amendment of the statute in 1983, which replaced the phrase "shall, as part of any fine imposed, pay an increment" (Stats. 1980, ch. 1222, § 1, p. 4140), with the phrase "shall pay a criminal laboratory analysis fee" (Stats. 1983, ch. 626, § 1, p. 2527). According to defendant, by recharacterizing the payment as "a criminal laboratory analysis fee" instead of a "part of any fine imposed," the Legislature indicated its intent to treat the payment as "a nonpunitive administrative fee" rather than punishment. In support of his assertion, he quotes from *People v. Watts* (2016) 2 Cal.App.5th 223, 234 (*Watts*), which stated: "The elimination of the reference to the fee's being part of the 'fine imposed' and its renaming from an 'increment' to a 'fee' strongly suggest that the Legislature did not intend the fee to be a 'fine, penalty, or forfeiture' " as those terms are used in in various penalty assessment statutes "because section 11372.5 calls it something else."[5]

_____

amended Mar. 24, 1980, Apr. 15, 1980, May 22, 1980, and June 9, 1980.) Analyzing this language, the Senate Committee on the Judiciary variously characterized the payment as "a special financial penalty," "a special fine," and "a special $50 penalty assessment." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1535 (1979–1980 Reg. Sess.) as amended Mar. 24, 1980, pp. 1-2.) The Assembly Committee on Criminal Justice likewise characterized the payment as "a special financial $50.00 penalty" and a "special fine[]." (Assem. Com. on Crim. Justice, Analysis of Sen. Bill No. 1535 (1979–1980 Reg. Sess.) as amended June 9, 1980, p. 1.) All of these formulations, as well as the language of the enacted 1980 statute — "part of any fine imposed" — indicate a legislative intent to punish. (Stats. 1980, ch. 1222, § 1, p. 4140.)

[5] The issue in *Watts* was whether the criminal laboratory analysis fee is subject to penalty assessments under various statutes that require "a certain dollar amount" to be added to " 'every fine, penalty, or forfeiture imposed and collected by the courts for criminal offenses.' " (*Watts*, at pp. 228-229.) "[F]or example, if the base fine is $100 and the penalty assessment is $2 for every $10 imposed, the penalty assessment increases the defendant's base fine by $20, or 20 percent." (*Id.*, at p. 228.) The *Watts* court held that the criminal laboratory analysis fee is not subject to these penalty assessments because it is not a "fine, penalty, or

*(footnote continued on next page)*

For several reasons, defendant's argument is unpersuasive. To begin with, it ignores the fact that the Legislature did *not* substantively change the two sentences in section 11372.5 that immediately followed the revised sentence. Those sentences provided: "The court shall increase *the total fine* necessary to include *this increment*. [¶] With respect to those offenses specified in this subdivision for which a fine is not authorized by other provisions of law, the court may, upon conviction, impose *a fine* in an amount not to exceed fifty dollars ($50), which shall *constitute the increment prescribed by this section* and which shall be in addition to any other *penalty* prescribed by law." (Stats. 1983, ch. 626, § 1, p. 2527, italics added.) These sentences indicate that the Legislature viewed the $50 "increment," even when characterized as a criminal laboratory analysis fee, as a "fine" and a "penalty."[6] (*Ibid.*) The first sentence also belies the statement in *Watts*, *supra*, 2 Cal.App.5th at page 234, that the Legislature "renam[ed]" the payment "from an 'increment' to a 'fee.' " Both the 1980 and 1983 versions of the statute referred to the payment as an "increment" of the "total fine," as does the current version.

---

forfeiture" as those terms are used in the applicable statutes. (*Id*. at p. 231.) In reaching this conclusion, it broke with settled law holding to the contrary. (*Id.* at pp. 231-232.) In *People v. Martinez* (2017) 15 Cal.App.5th 659, and *People v. Webb* (2017) 13 Cal.App.5th 486, the courts adopted *Watts*'s holding and extended it to drug program fees. The issue is pending before us in a number of cases.

[6] Regarding the first of these sentences, whereas the 1980 statute directed courts to "increase the total fine *as* necessary to include this increment" (Stats. 1980, ch. 1222, § 1, p. 4140, italics added), the 1983 statute omitted the word "as" and directed courts to "increase the total fine necessary to include this increment" (Stats. 1983, ch. 626, § 1, p. 2527). Regarding the second sentence, the 1983 amendment added commas to offset the phrase "upon conviction" and changed the final phrase from "other penalty authorized by law" (Stats. 1980, ch. 1222, § 1, p. 4140) to "other penalty prescribed by law" (Stats. 1983, ch. 626, § 1, p. 2527). Nothing about these alterations suggests a change in the Legislature's view that the payment, even when called a criminal laboratory analysis fee, was a "fine" and a "penalty."

Moreover, the analysis of defendant and the *Watts* court would produce an anomalous result. In cases where "a fine is not authorized by other provisions of law," the second paragraph of section 11372.5, subdivision (a), expressly characterizes the $50 "increment prescribed by this section" as "a fine" to be imposed "in addition to any other penalty prescribed by law." Under the analysis of defendant and the *Watts* court, the very same "increment" (*ibid*), when assessed pursuant to the first paragraph of the very same statute — because of the existence of other fines — is simply an administrative fee. Defendant suggests no reason — and we can think of none — why the Legislature would, in a single subdivision, view the same increment differently based on this distinction. "It is an established rule of judicial construction that when a term appears in different parts of the same act, or in related sections of the same code, the term should be construed as having the same meaning in each instance." (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1268.) We therefore reject *Watts*'s anomalous conclusion that the criminal laboratory analysis fee "is by its nature not punishment and therefore not a 'fine' or 'penalty' except," as the second paragraph of section 11372.5, subdivision (a), specifies, "in the case of an offense 'for which a fine is not authorized by other provisions of law.'" (*Watts*, *supra*, 2 Cal.App. 5th at p. 235.)

Indeed, nothing in the legislative history of the 1983 amendment supports the view that the change in language defendant cites reflects a legislative intent to change the increment from a fine or penalty to an administrative fee. As introduced, the bill that amended the statute — Assembly Bill No. 2044 — proposed: (1) adding new crimes to the list of specified offenses; (2) changing the phrase "shall, as part of any fine imposed, pay an increment in the amount of fifty dollars ($50) for each separate offense" to "shall pay a criminal laboratory analysis fee in the amount of fifty dollars ($50) for each separate offense whether or not a fine is imposed"; and (3) deleting the rest of section 11372.5, subdivision (a), which, as noted above, directed courts to "increase the total fine as necessary to include this increment" and, as to specified offenses "for which a fine is not

14

authorized by other provisions of law," authorized courts to "impose" the "increment" as "a fine . . . in addition to any other penalty authorized by law." (Assem. Bill No. 2044 (1983-1984 Reg. Sess.) as introduced Mar. 7, 1983, § 1.) The Assembly Committee on Public Safety objected to the proposed language imposing the criminal laboratory analysis fee "in <u>all</u> cases whether or not a fine is ordered," asserting that this language "makes no exception for the defendant's inability to pay." (Assem. Criminal Law and Pub. Safety Com., Analysis of Assem. Bill No. 2044 (1983-1984 Reg. Sess.) as amended Apr. 11, 1983.) It suggested that the bill be revised either to "provide an ability to pay exception" or to "return to current law," which, "by making the fee part of a fine (which the court has the discretion to suspend), contains an implicit means test." (*Ibid.*)

The Assembly quickly responded by essentially adopting the latter suggestion, i.e., "return[ing] to current law," which "mak[es] the fee part of a fine." (Assem. Crim. Law and Pub. Safety Com., Analysis of Assem. Bill No. 2044 (1983-1984 Reg. Sess.) as amended Apr. 11, 1983, p. 2.) Although retaining the new designation of the increment as "a criminal laboratory analysis fee," the Assembly deleted the proposed phrase "whether or not a fine is imposed" and revived those parts of the 1980 statute that the earlier version would have deleted, by reinserting (with minor revisions (see fn. 4, *supra*)) the language requiring courts to "increase the total fine necessary to include this increment" and, as to specified offenses "for which a fine is not authorized by other provisions of law," permitting courts to "impose" the "increment" as "a fine . . . in addition to any other penalty authorized by law." (Assem. Bill No. 2044 (1983-1984 Reg. Sess.) as amended May 2, 1983, § 1.)

Several analyses of this revised form of the bill explained that (1) existing law requires those convicted of specified controlled substance offenses to "pay an additional $50 as part of any fine imposed," and (2) the proposed amendment "[s]pecifies that the $50 *fine* is a criminal laboratory analysis fee." (Assem. Crim. Law & Pub. Safety Com., 3d reading analysis of Assem. Bill No. 2044 (1983–

15

1984 Reg. Sess.) as amended June 20, 1983, p. 1; see Assem. Conc. Sen. Amends. to Assem. Bill No. 2044 (1983–1984 Reg. Sess.) as amended July 19, 1983, p. 1.) The analysis of the Senate Committee on Judiciary similarly explained that (1) existing law requires those convicted of specified controlled substance offenses "to pay an additional $50 as part of any fine imposed," and (2) the proposed amendment "would describe that $50 increment as a criminal laboratory analysis fee." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2044 (1983–1984 Reg. Sess.) as amended May 2, 1983, pp. 1-2.) It also described the proposed bill as requiring payment of "a $50 criminal laboratory analysis fee in addition to any *other penalty* that was imposed" (*id*. at p. 1, italics added), and explained that the bill would "in effect . . . raise the legal maximum *fine*" for one of the crimes added to the list of specified offenses (*id*. at p. 3). In summary, the evolution of the 1983 amendment and the accompanying bill analyses indicate that the Legislature: (1) understood that the 1980 statute established a fine or penalty; and (2) understood *and intended* that, notwithstanding the new nomenclature for the $50 payment — criminal laboratory analysis fee — the payment would continue to be a fine or penalty. Certainly, nothing in these sources suggests the Legislature either understood or intended that the new nomenclature would transform the existing fine or penalty into an administrative fee.

Subsequent legislative developments are fully consistent with these conclusions. In 1985, the Legislature added new crimes to the statute's list of specified offenses. (Stats. 1985, ch. 1098, § 5.) In describing this amendment, the Legislative Counsel's Digest explained: "Existing law requires every person who is convicted of specified controlled substance offenses to pay an additional $50 *fine imposed as a criminal laboratory analysis fee . . . .* [¶] This bill would include additional specified offenses . . . within these provisions." (Legis. Counsel's Dig., Assem. Bill No. 2401 (1985–1986 Reg. Sess.) 4 Stats. 1985, Summary Dig., p. 380, italics added.) Consistent with this description, the Legislative Analyst explained that the 1985 amendment would "[m]ake[] persons

16

convicted of certain acts relating to the manufacture of phencyclidine (PCP), subject to" some of the "existing *penalties and punishments* that are imposed for other controlled substances violations," including "an additional $50 *fine* imposed as a criminal laboratory analysis fee." (Legis. Analyst, Analysis of Assem. Bill No. 2401 (1985-1986 Reg. Sess.) as amended May 1, 1985, pp. 1-2.) In 1986, the Legislature again added new crimes to subdivision (a)'s list of specified offenses and, in the subdivision's second paragraph, changed the phrase "the court *may*, upon conviction, impose a fine . . . which shall constitute the increment prescribed by this section" (Stats. 1983, ch. 626, § 1, p. 2527, italics added) to "the court *shall*, upon conviction, impose a fine . . . which shall constitute the increment prescribed by this section . . . ." (Stats. 1986, ch. 587, § 1, p. 2056, italics added). The Legislative Counsel's Digest explained that the latter change would make mandatory the "fine" that the subdivision's second paragraph authorized. (Legis. Counsel's Dig., Assem. Bill No. 3642 (1985–1986 Reg. Sess.) 4 Stats. 1986, Summary Dig., p. 188.)

At this point, the legislative history of section 11372.7, which the Legislature approved about a month after approving the 1986 amendment to section 11372.5, becomes relevant to the Legislature's understanding and intent regarding both statutes. Analyses of the bill through which the Legislature enacted section 11372.7 repeatedly described the payment that section prescribes as a "fine," a "penalty," and/or a "penalty assessment." For example, several analyses explained that the proposed statute "would . . . impos[e] a $100 *fine* on every person convicted" of a specified offense, that "[t]he fine" is "referred to" in the statute "as 'a drug program fee,' " and that "[a]ny other penalty prescribed by law would not be affected" by the new statute. (Sen. Select Com. on Drug/Alcohol Abuse, 3d reading analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Apr. 30, 1985, p. 2; see Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended June 18, 1986; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as

17

amended Apr. 1, 1985; Sen Rules Com., Office of Sen. Floor Analyses, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Aug. 18, 1986.)  Other analyses stated that the new statute would "provide an enhanced penalty" for specified offenders, the proceeds of which would be used "for drug abuse prevention and treatment programs."  (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.); Sen. Com. on Judiciary, com. on Sen. Bill No. 921 (1985–1986 Reg. Sess.).)  Several analyses explained that some opponents of the proposed bill were generally "opposed to any additional *penalty assessments* for criminal offenses," and that other opponents believed the proposed "additional *penalty*" would constitute "excessive *punishment* especially in cases of indigency."  (Sen. Select Com. on Drug/Alcohol Abuse, 3d reading analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Apr. 30, 1985, p. 4; Sen Rules Com., Off. of Sen Floor Analyses, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Aug. 18, 1986, p. 4.)  Another analysis explained that certain groups "oppose[d] th[e] bill because the additional *fine* imposed by [the proposed statute] would more than double existing *penalty assessments* in many instances."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Apr. 11, 1985, p. 6, italics added.)

Several analyses of the bill that proposed section 11372.7 also referred to section 11372.5.  For example, after stating that the proposed statute would "impos[e] a $100 fine on" those convicted of specified controlled substance offense, the analysis of the Senate Committee on Judiciary explained:  "Currently *fines* for controlled substance offenders are governed by Section 11372.5," which imposes as a "fine" a "$50 criminal laboratory analysis fee."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Apr. 11, 1985, p. 4, italics added; see also Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Aug. 18, 1986, p. 2) [identifying "$50 criminal laboratory analysis fee" as a "fine" imposed "by the Health and Safety Code" on "controlled substance offenders"];

18

Sen. Select Com. on Drug/Alcohol Abuse, 3d reading analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.) as amended Apr. 30, 1985, p. 2 [same].) These legislative materials support the conclusion that when the Legislature amended section 11372.5 and enacted section 11372.7 in 1986, it understood and intended that the payments these sections prescribe are fines, penalties, and punishment.

Subsequent legislative developments also support this conclusion. As enacted, subdivision (c) of section 11372.7 provided in part: "For every drug program fee assessed pursuant to subdivision (a), an amount equal to this assessment shall be deposited into [a drug program] fund for every conviction pursuant to this chapter . . . ." (Stats. 1986, ch. 1027, § 3, p. 3558.) In 1987, the Legislature amended this provision by changing the phrase "assessed" to "assessed and collected." (Stats. 1987, ch. 247, § 1, p. 1235.) According to the legislative history, the purpose of this amendment was to "clarif[y] . . . that the county should only deposit funds collected." (Sen. Com. on Judiciary, com. on Sen. Bill No. 639 (1987-1988 Reg. Sess.), p. 1.) As here relevant, various bill analyses referred to drug program fees as "penalty assessments" and/or "fines." (*Ibid*. ["Under existing law it is unclear as to whether the counties have to deposit drug and alcohol penalty assessments into a special fund, upon conviction of offender or upon collection of the assessment"]; Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 639 (1987-1988 Reg. Sess.) [same]; Legis. Analyst, Analysis of Sen. Bill No. 639 (1987-1988 Reg. Sess.) as amended June 16, 1987, p. 1 ["this bill makes various technical changes to current law relating to penalty assessments for specified alcohol- and drug-related offenses"]; Assem. Ways & Means Com., Analysis of Sen. Bill No. 639 (1987-1988 Reg. Sess.) as amended June 16, 1987 [bill "would make several technical clarifications to the laws regarding . . . drug fines" and "require evaluations of drug and alcohol programs funded by these fines"]; Dept. of Fin., Analysis of Sen. Bill No. 639 (1987-1988 Reg. Sess.) [bill "provides clarification that these fines are to be deposited . . . upon collection, rather than upon conviction"]; Sen. Rules Com., Off. of Sen. Floor Analyses,

19

Analysis of Sen. Bill No. 639 (1987-1988 Reg. Sess.) as amended June 16, 1987, p. 1 ["clarifies" legislature's "intent" that "drug and alcohol program fines be deposited upon collection, rather than upon conviction"].)

In 1993, the Legislature, through passage of Assembly Bill No. 855, increased the maximum amount of section 11372.7's drug program fee from $100 to $150. (Stats 1993, ch. 474, § 1.) As introduced, the bill did not amend section 11372.5, but instead proposed adding a new section that would have required specified offenders to pay "a drug abuse education and prevention *penalty assessment* in an amount not to exceed fifty dollars." (Assem. Bill No. 855 (1993-1994 Reg. Sess.) as introduced Feb. 25, 1993, § 1, italics added.) Regarding this proposal, the Senate Committee on Judiciary explained: "[E]xisting law already provides a $100 *penalty assessment* for the same universe of individuals covered by this bill. Proceeds from this *assessment* are also to be used only for the support of drug programs within the schools and the community. (*H. & S.C. Sec. 11372.7*) Thus, in effect, this bill proposes to create a new body of law in order to increase *an existing penalty* from $100 to $150." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 855 (1993-1994 Reg. Sess.) as amended Mar. 29, 1993, p. 3.) The Senate Committee on Judiciary then posed this question: "Should not *the existing penalty assessment* for persons convicted of controlled substance offenses be increased by $50 in lieu of creating a new section of the law?" (*Ibid.*) The Legislature soon followed this suggestion by omitting the new section from the bill and adding an amendment to section 11372.7 that increased the maximum amount of its drug program fee from $100 to $150. (Assem. Bill No. 855 (1993-1994 Reg. Sess.) as amended Aug. 17, 1993, § 1.) These postenactment revisions to section 11372.7 and their legislative history further indicate that the Legislature understands and intends the section's "drug program fee" to constitute a fine, a penalty, a punishment.

Defendant largely ignores these clear indicators of legislative intent. Instead, he relies on the Court of Appeal's assertion in *People v. Vega* (2005) 130

Cal.App.4th 183, 195 (*Vega*), that "the main purpose" of section 11372.5 "is not to exact retribution against drug dealers or to deter drug dealing . . . but rather to offset the administrative cost of [drug] testing." Building on this assertion, defendant argues that "because the main purpose" of section 11372.5 "is neither retribution [n]or deterrence, but rather to offset the costs of laboratory tests in the prosecution of narcotics cases, the fee imposed under that section is simply an administrative fee, not punishment." He makes a similar argument regarding section 11372.7, asserting that the "fundamental purpose" of the drug program fee "is to offset" the cost of certain government programs.

Initially, neither the language of the statutes nor their legislative history persuades us to adopt defendant's view of the Legislature's "main purpose" in establishing these charges. As already explained, both statutes refer to the charges as "fine[s]" and provide that, in some cases, the fine "shall be in addition to any *other* penalty prescribed by law." (§ 11372.5, subd. (a); § 11372.7, subd. (a).) In terms of legislative history, several analyses of the legislation that enacted section 11372.7 emphasized that the statute "seeks to provide *an enhanced penalty* for those convicted of drug violations." (Assem. Com. on Pub. Safety, Analysis of Sen. Bill No. 921 (1985–1986 Reg. Sess.), p. 2, italics added; Sen. Com. on Judiciary, com. on Sen. Bill No. 921 (1985–1986 Reg. Sess.), italics added.) And an analysis of the legislation that amended section 11372.5 in 1983 — by adopting the term "criminal laboratory analysis fee" and expanding the list of offenses subject to that charge (Stats. 1983, ch. 626, § 1, p. 2527) — explained that a purpose of the fee was to "provide an additional reminder to offenders of the true cost of their acts." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2044 (1983-1984 Reg. Sess.) as amended May 2, 1980, p. 4.) This description discloses a legislative intent to promote one of "the traditional aims of punishment" (*People v. Alford*, *supra*, 42 Cal.4th at p. 759) — deterrence — "by warning the offender, and others tempted to commit the same violation, of the price to be paid for such actions" (*Alva*, *supra*, 33 Cal.4th at p. 288). Thus, the statutory language and

21

legislative history undermine defendant's claim regarding the Legislature's "main purpose" in establishing the criminal laboratory analysis and drug program fees.

In any event, even accepting defendant's assertion, we reject his argument that the criminal laboratory analysis and drug program fees are not "punishment" for purposes of Penal Code section 182. As earlier noted, that section provides that a convicted conspirator is "punishable in the same manner and to the same extent as is provided for the punishment of" the underlying target offense. (*Ibid.*) As also noted earlier, we held in *Athar*, *supra*, 36 Cal.4th at page 405, that the "general plain meaning" of this language renders a convicted conspirator subject to "*all* punishment for" the underlying target offense. (Italics added.) Where it is clear that one of the Legislature's purposes in prescribing a sanction is to impose punishment, excluding that sanction based on a finding that its "main" purpose is nonpunitive would preclude courts from complying with Penal Code section 182's "plain meaning" and would thwart the Legislature's intent that a convicted conspirator receive "*all* punishment for" the underlying target offense. (*Athar*, at p. 405, italics added.) Therefore, even accepting defendant's assertion that the Legislature's "main purpose" in prescribing the criminal laboratory analysis and drug program fees was "to offset" the cost of certain government programs, because the Legislature also intended these charges to constitute punishment, they fall within the sentencing scope of Penal Code section 182.

Supporting this conclusion is our decision in *People v. Talibdeen* (2002) 27 Cal.4th 1151 (*Talibdeen*), on which the People rely. There, the trial court imposed a criminal laboratory analysis fee under section 11372.5 in connection with a conviction of cocaine possession. (*Id.* at p. 1153.) On review, the People asked the Court of Appeal to impose additional amounts under Penal Code section 1464 and Government Code section 76000, subdivision (a), which respectively require the levy of an additional state and county "penalty . . . upon every fine, penalty, or forfeiture imposed and collected by the courts for criminal offenses." (*Talibdeen*, at pp. 1153-1154.) The Court of Appeal did so, notwithstanding the People's

22

failure to raise the issue in the trial court, concluding that these additional penalties "were mandatory — and not discretionary — sentencing choices." (*Id.* at p. 1153.) We affirmed, reasoning that the statutes "called for the imposition of" the penalties "based on such a fee" (*ibid.*) — i.e., section 11372.5's criminal laboratory analysis fee — and that, in the defendant's circumstances, "imposition of these penalties [was] mandatory" (*id.* at p. 1155).

As defendant observes, several courts of appeal have stated that *Talibdeen* is not dispositive of whether section 11372.5, subdivision (a)'s criminal laboratory analysis fee constitutes either a punishment or a penalty. In *Vega*, *supra*, 130 Cal.App.4th at page 195, the court concluded that "*Talibdeen* is not controlling" as to whether section 11372.5's criminal laboratory analysis constitutes "punishment" for purposes of Penal Code section 182, because *Talibdeen* "did not address [this] question . . . . Rather, the court and the parties in *Talibdeen* proceeded under the assumption the fee was a punishment and addressed the question whether the trial court had discretion to waive the penalty assessments." Taking a similar view, in *Watts*, *supra*, 2 Cal.App.5th at page 231, the court declared that *Talibdeen* is not "authority for the proposition" that the criminal laboratory analysis fee is a "fine, penalty, or forfeiture" within the meaning of Penal Code section 1464 and Government Code section 76000, subdivision (a). The court reasoned: "The defendant in *Talibdeen* never argued that the assessments were inapplicable, and the Supreme Court never mentioned section 11372.5's language. Instead, the court focused on whether the statutes establishing the state and county penalties gave a sentencing court discretion to waive those assessments . . . . [Citation.] Thus, the [*Talibdeen*] court assumed, but never decided, that sentencing courts are required to impose penalty assessments on the crime-lab fee." (*Watts*, at p. 231.) Based on these decisions, defendant asserts that *Talibdeen* does not "compel" the conclusion that the fees here at issue constitute "punishment" for purposes of Penal Code section 182.

23

Although we agree with defendant that *Talibdeen* is not dispositive, it clearly supports our conclusion. As noted above, the central issue there was whether imposition of the additional penalties was "mandatory" — in which case they could be imposed on appeal notwithstanding the People's failure to object below — or "discretionary" — in which case they could not be imposed on appeal. (*Talibdeen*, *supra*, 27 Cal.4th at p. 1153.) A prerequisite to our holding that the penalties were, in fact, mandatory was that section 11372.5's criminal laboratory analysis fee constituted a "fine, penalty, or forfeiture" within the meaning of Penal Code section 1464 and Government Code section 76000, subdivision (a). Consistent with this fact, as noted above, we affirmatively stated that the statutes there at issue "called for the imposition of" the penalties "based on such a fee," i.e., "a laboratory analysis fee of $50 pursuant to . . . section 11372.5, subdivision (a)." (*Talibdeen*, at p. 1153.) It is true, as *Watts* and *Vega* noted, that we did not in *Talibdeen* mention section 11372.5's language, indicate whether the defendant argued the penalty assessments were inapplicable (as opposed to discretionary), or expressly discuss whether the criminal laboratory analysis fee constitutes a "fine, penalty, or forfeiture" within the meaning of Penal Code section 1464 and Government Code section 76000, subdivision (a). However, it is also true that we made no reference to any "assumption" (*Vega*, *supra*, 130 Cal.App.4th at p. 195) as the basis for our affirmative statement that the statutes there at issue "called for the imposition of" the penalties "based on" the criminal laboratory analysis fee. (*Talibdeen*, at p. 153.) In short, regardless of whether *Talibdeen*, as defendant puts it, "compel[s]" the conclusion that section 11372.5's criminal laboratory analysis constitutes "punishment" for purposes of Penal Code section 182, as the court stated in *Vega*, *supra*, 130 Cal.App.4th at page 194, *Talibdeen* surely "support[s]" that conclusion.

By contrast, our decision in *People v. Alford*, *supra*, 42 Cal.4th 749, on which defendant relies, provides little support for his view. There, we held that the court security fee Penal Code section 1465.8, subdivision (a)(1) imposes on

24

"every conviction for a criminal offense" is not punishment for purposes of constitutional prohibitions against ex post facto laws. (See *Alford*, at pp. 755-759.) We first found that the Legislature, in enacting this statute, did not intend to impose punishment. (*Id.* at pp. 756-757.) We cited the following factors in support of this conclusion: (1) the Legislature referred to the charge as a fee, not a fine; (2) the Legislature did not limit the fee to the criminal context, imposing it also in limited and unlimited civil actions and in probate matters; (3) by requiring the fee's collection upon posting of bail, the Legislature imposed the fee on arrestees who would never be criminally charged by information, indictment, or complaint; (4) the Legislature required the fee's imposition when a traffic violation charge was *dismissed* because the alleged violator attends traffic school; (5) the Legislature enacted the fee statute as part of an emergency budgetary measure, along with 23 other trailer bills that collectively provided a mechanism to implement critical provisions of the state budget for the 2003-2004 fiscal year;[7] and (6) the fee was to go into effect only if the Legislature enacted specified levels of trial court funding. (*Ibid.*) We next concluded that the fee was not so punitive in nature or effect as to negate the Legislature's intent and transform the fee into a criminal penalty. (*Id.* at pp. 757-759.)

As this discussion makes clear, there are significant differences between the indicia of legislative intent we cited in *People v. Alford* regarding the court security fee and the indicia of legislative intent regarding the charges at issue in this case. Whereas the Legislature referred to the court security charge as a fee, as we have explained, both the statutes and the legislative history refer to the criminal laboratory analysis and drug program fees as fines, penalties, and punishments. Whereas the Legislature did not require a criminal conviction for imposition of the court security fee, and imposed that fee even in the civil context, it provided for

---

[7] Elsewhere in our opinion, we explained that the 2003 Budget Act reduced General Fund financing for trial courts in the same amount that the fee was projected to generate: $34 million. (*People v. Alford*, *supra*, 42 Cal.4th at p. 754.)

imposition of the criminal laboratory analysis and drug program fees *only in the criminal context and only upon conviction*. Finally, unlike the court security fee, the criminal laboratory analysis and drug program fees were not enacted as part of an emergency budgetary measure in order to exactly offset a reduction in General Fund financing for trial courts. Given these differences regarding legislative intent, our conclusion here that the criminal laboratory analysis and drug program fees are punishment for purposes of the conspiracy sentencing statute is not at all in tension with our conclusion in *People v. Alford* that the court security fee is not punishment for ex post facto purposes.

As noted earlier, a finding that the Legislature intended a particular sanction to constitute punishment " 'ends the inquiry.' " (*Mosley*, *supra*, 60 Cal.4th at p. 1063.) Because, for reasons explained above, it is clear the Legislature intended the fees at issue here to be punishment, it is "unnecessary to pursue any additional inquiry into their underlying character." (*People v. Hanson* (2000) 23 Cal.4th 355, 361 [finding, for purposes of applying the double jeopardy clause, that Legislature intended restitution fines to be "punishment"].)**8**

Shortly before oral argument, defendant filed a request to submit supplemental briefing on two additional issues: (1) whether the criminal laboratory analysis fee and the drug program fee are subject to penalty assessments (see fn. 5, *ante*); and (2) whether a firearm sentence enhancement he received under Penal Code section 12022.53, subdivision (c), was affected by that statute's recent amendment (Stats. 2017, ch. 682, § 2). We denied his request. We leave it to the Court of Appeal to decide how to address these issues on remand should defendant elect to pursue them.

---

**8** We disapprove *People v. Martinez* (2017) 15 Cal.App.5th 659, *People v. Webb* (2017) 13 Cal.App.5th 486, *People v. Watts* (2016) 2 Cal.App.5th 223, and *People v. Vega* (2005) 130 Cal.App.4th 183, to the extent they are inconsistent with our analysis and conclusion.

26

**DISPOSITION**

We affirm the decision of the Court of Appeal and remand to that court for further proceedings consistent with this opinion.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C.J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**ASHMANN-GERST, J.\***

_____

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Ruiz II

_____

**Unpublished Opinion** XXX NP opn. filed 5/19/16 – 5th Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S235556
**Date Filed:** May 17, 2018

_____

**Court:** Superior
**County:** Tulare
**Judge:** Joseph Kalashian

_____

**Counsel:**

Elizabeth Campbell, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Rachelle Newcomb and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elizabeth Campbell
PMB 334
3104 O Street
Sacramento, CA  95816
(530) 786-4108

Peter H. Smith
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5114