Filed 9/28/21  P. v. Duggan CA3
Opinion following transfer from Supreme Court.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C079809 |
| v. | (Super. Ct. No. CM041015) |
| ROBERT DUANE DUGGAN, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

Defendant Robert Duane Duggan forced his way into Robert Bledsoe's apartment and shot him 10 times with a semiautomatic handgun, including once in the right eye. Bledsoe survived the attempt on his life, but lost his eye.  Defendant was convicted by jury of attempted murder, mayhem, possession of a firearm by a convicted felon, and possession of cocaine.  With respect to the first two counts, the jury also found defendant personally and intentionally discharged a firearm causing great bodily injury.  In a bifurcated proceeding, the trial court found true an allegation defendant served a prior

1

prison term for a 2007 grand theft conviction. Defendant was sentenced to serve an aggregate indeterminate term of 32 years to life consecutive to an aggregate determinate term of 4 years.

On appeal, defendant contends: (1) his trial counsel provided constitutionally deficient assistance by failing to consult with and retain an expert in blood spatter analysis or accident reconstruction; (2) the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury to consider the level of certainty with which an eyewitness made an identification in evaluating the accuracy of that identification; (3) various sentencing errors occurred; (4) we must remand the matter for a new sentencing hearing because Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), which became effective January 1, 2018, and gives the trial court discretion to strike a firearm enhancement in the interest of justice, applies retroactively to cases not yet final on appeal; and (5) we must also strike defendant's one-year prior prison term enhancement because Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136), effective January 1, 2020, also applies retroactively to cases not yet final on appeal and eliminates this enhancement for defendant's prior crime.

We shall affirm defendant's convictions, strike his prior prison term enhancement, and remand the matter for resentencing. With respect to the convictions, we conclude defendant's ineffective assistance claim is not cognizable on appeal. With respect to defendant's challenge to CALCRIM No. 315's inclusion of certainty as a factor to be used in evaluating the accuracy of an identification, we initially rejected that challenge as having previously been rejected by our Supreme Court. After our initial opinion was filed, our Supreme Court granted review and thereafter decided *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), "acknowledg[ing] the current version of the instruction might confuse jurors about the relationship between confidence and accuracy" of an

identification. (*Id.* at p. 666.) The court then transferred the matter back to this court with directions to vacate our initial opinion and reconsider the cause in light of *Lemcke*. Having done so, we conclude defendant was not prejudiced by the instruction and his federal constitutional rights were not violated.

With respect to sentencing, we conclude the matter must be remanded to the trial court for resentencing. However, while we also conclude Senate Bill 620 applies retroactively to defendant's case, we decline to remand for an exercise of discretion regarding the firearm enhancement because the trial court indicated it would not have stricken that enhancement had it possessed such discretion at the time it was imposed. Finally, retroactive application of Senate Bill 136 requires defendant's prior prison term enhancement be stricken.

FACTS

At about 3:00 a.m. on April 12, 2014, Bledsoe was sleeping on his couch when he awoke to the sound of someone trying to open his front door. When he got up and opened the door, defendant was standing there, wearing a dark hooded sweatshirt and dark gloves, and holding a semiautomatic handgun. Bledsoe knew defendant as, "Young Rob," having met him through friends, but did not know him very well. As Bledsoe explained, "he was just someone that was along with other people" at various "party-type" and "get-together-type situations." When Bledsoe saw the gun, he tried to close the door, but defendant used his foot to prevent the door from closing. While pushing against the door, Bledsoe asked what defendant wanted. Defendant said Bledsoe owed him money, which was not true.

Defendant then forced his way into Bledsoe's apartment. While Bledsoe was not certain, he believed defendant shot him through the door in order to gain entry into the apartment. Bledsoe believed this because he weighed 360 pounds at this point in his life,

3

whereas defendant was a much smaller man and would not have been able to overpower him otherwise.  Once inside, a physical altercation ensued between the front door and the kitchen.  As Bledsoe explained:  "When he came in, we kind of tussled, and I remember grabbing him -- or grabbing his arms as he was coming in and then from that point, I remember a lot of gunfire, flashes, the smell of gun smoke, and feeling this, like, heat, . . . it was just like a hard hit and then I felt real warm."  Multiple rounds hit Bledsoe in the chest, his left leg, and left arm.  One round hit him in the shoulder and another hit him in his right eye.  At some point during the barrage of bullets, Bledsoe fell face down onto the kitchen floor.  He reached up to use the counter to try to pull himself to his feet, but was unable to move his legs.  Defendant then fired a final round into Bledsoe's back before leaving the apartment.

Bledsoe managed to crawl out of his front door and call out for help.  One of his neighbors, who heard the gunshots and subsequent cries for help, told her daughter to call 911 and then came outside to find Bledsoe on his front porch.  He was covered in blood and "one of his eyes was hanging out" of its socket.  The neighbor also flagged down a passing car and told the driver someone had been shot and to call 911.  The neighbor then ran back to Bledsoe and tried to calm him down while they waited for the ambulance.

Police and emergency medical personnel arrived a short time later.  One of the responding officers, who accompanied Bledsoe to the hospital in the ambulance, asked Bledsoe if he knew who shot him.  Bledsoe identified the shooter as, "Young Rob," someone he knew "from around the area."  After determining defendant lived in the area and went by that name, a photographic lineup including defendant's photo was prepared and administered at the hospital.  Bledsoe identified defendant as the shooter in that lineup.  Defendant was arrested in his car in front of his house about 45 minutes after the shooting.  He had in his possession a useable amount of cocaine.

4

The following evidence corroborates Bledsoe's identification of defendant as the shooter. Bledsoe was shot with 9-millimeter rounds. While the weapon used to shoot him was not recovered, a video on defendant's cell phone, taken five days before the shooting, showed defendant firing a Springfield XD 9-millimeter semiautomatic handgun in a field. Ten rounds were fired in the video. When the video was recorded, the cell phone's GPS locator was activated. A detective went to those GPS coordinates, which corresponded to the field depicted in the video, and recovered ten 9-millimeter shell casings. A forensic analysis of the shell casings recovered from the field and those recovered from Bledsoe's apartment indicated both sets of casings were fired from the same gun.[1]

We recite the evidence adduced during the defense case in the discussion portion of the opinion, to which we now turn.

## DISCUSSION

## I

### *Ineffective Assistance of Counsel*

Defendant contends his trial counsel provided constitutionally deficient assistance by failing to consult with and retain an expert in blood spatter analysis or accident reconstruction, asserting this expert would have concluded and testified defendant would likely have had blood on him and been injured in the struggle with Bledsoe. This contention is not cognizable on appeal.

---

[1]    A cell tower analysis of defendant's cell phone also revealed that phone was in the general vicinity of Bledsoe's apartment from 2:05 a.m. until 2:25 a.m., less than an hour before the shooting, then connected to a tower slightly farther away from that apartment until 2:36 a.m., at which point the cell phone stopped all activity until 3:30 a.m., about 30 minutes after the shooting.

## A.

### *Additional Background*

The defense case consisted of evidence that defendant did not have any blood on him when he was arrested following the shooting, no bloody clothing was recovered from his house, there was no blood in his car, the only apparent injury to defendant was "slight redness to his left forearm," and no gunshot residue testing was performed. The defense also adduced evidence that Bledsoe's apartment was near California State University, Chico, and the area would have been busy with nightlife between the hours of 11:30 p.m. and 2:30 a.m. the night of the shooting. From this, defense counsel argued there was a reasonable doubt about defendant's identity as the shooter, especially in light of the violent altercation Bledsoe described and the substantial amount of blood found in his apartment. However, as mentioned, the shooting occurred at about 3:00 a.m. and defendant was not arrested in front of his house until about 3:45 a.m. The prosecution also established it would have taken only "7-10 minutes" for defendant to drive home from Bledsoe's apartment, and argued during closing argument that defendant therefore "would have had time to shower, change his clothes, get rid of his clothes" before he was taken into custody.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden

of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 855; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

Defendant's claim of ineffective assistance of counsel is not cognizable on direct appeal because the record does not reveal the reason for the absence of expert testimony regarding blood spatter analysis or accident reconstruction. Defendant asserts his trial counsel failed to consult such experts, assumes their opinion would have been helpful to his defense if consulted, and argues the failure to consult and retain experts to testify for the defense amounted to constitutionally deficient performance. However, the record is silent as to whether or not defense counsel consulted any experts, and if not, the reasons for failing to do so, or if so, the reasons for deciding not to call them to testify. " 'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.

7

[Citation.]' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)  Here, we simply do not know whether or not defense counsel consulted such experts.  And a potentially satisfactory explanation for failing to call experts to testify is that their testimony would not have been particularly helpful.  Indeed, defense counsel might have known the prosecution would be arguing defendant likely had blood on him when he left Bledsoe's apartment and had time to shower, change clothes, and get rid of the bloody clothes before being arrested.

We must therefore reject defendant's ineffective assistance claim.

## II

### *Instructional Error*

Defendant also claims the trial court prejudicially erred and violated his federal constitutional rights by instructing the jury with a portion of CALCRIM No. 315, telling the jury to consider the level of certainty with which an eyewitness made an identification in evaluating the accuracy of that identification.[2]  Defendant did not object to this

---

**2**      As delivered to the jury in this case, CALCRIM No. 315 provides:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  In evaluating identification testimony, consider the following questions:  Did the witness know or have contact with the defendant before the event?  How well could the witness see the perpetrator?  What were the circumstances affecting the witness's ability to observe, such as, lighting, weather conditions, obstructions, distance and duration of observation[?]  [¶] How closely was the witness paying attention[?]  Was the witness under stress when he or she made the observation?  Did the witness give a description, and how does that description compare to the defendant?  How much time passed between the event and the time when the witness identified the defendant[?]  [¶]  Was the witness asked to pick the perpetrator out of a group?  Did the witness ever fail to identify the defendant?  Did the witness ever[] change his or her mind about the identification?  *How certain was the witness when he or she made an identification?*  Are the witness and the defendant of different races?  Was the witness able to identify the defendant in a photographic or physical lineup?  Were there any other circumstances affecting the witness's ability to

8

instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

As mentioned previously, in our original opinion in this matter, we concluded there was no error, relying on three prior decisions of our Supreme Court: *People v. Wright* (1988) 45 Cal.3d 1126, *People v. Johnson* (1992) 3 Cal.4th 1183, and *People v. Sanchez* (2016) 63 Cal.4th 411. As we explained, in *Wright*, the court "specifically approved" CALCRIM No. 315's predecessor, CALJIC No. 2.92, "including its certainty factor," and in *Johnson*, the court "reiterated the propriety of including this factor." (*Sanchez*, at p. 462.) In *Sanchez*, the court noted certain out-of-state cases have disapproved instructing on the certainty factor in light of "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy" (*id*. at p. 461), but ultimately declined to reexamine its previous holdings, explaining there were a number of identifications in the case, some certain and some uncertain, and therefore it was "not clear that even those [out-of-state] cases would prohibit telling the jury it may consider this factor" in a case where the defendant "would surely want the jury to consider how *uncertain* some of the identifications were." (*Id*. at p. 462.) The *Sanchez* court further stated: "Any reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications." (*Ibid*.)

---

make an accurate identification? [¶] The People have the burden of proving, beyond a reasonable doubt, that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added.)

That case was *Lemcke*, *supra*, 11 Cal.5th 644, an assault and robbery case in which the "primary evidence" establishing the defendant's guilt at trial was the victim's testimony identifying the defendant and confirming that she had also previously identified him during a photographic lineup. (*Id*. at p. 646.) Our Supreme Court rejected the defendant's argument that the certainty portion of CALCRIM No. 315 violated his federal and state due process rights, but agreed with amici curiae that this portion of the instruction "tends to reinforce" the "common misconception . . . that an identification is more likely to be reliable when the witness has expressed certainty." (*Id*. at p. 647.) The court "refer[red] the matter to the Judicial Council of California and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy," and in the meantime, directed trial courts to "omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id*. at pp. 647-648.)

Here, Bledsoe knew defendant and identified him as the shooter both in a photographic lineup at the hospital and at trial. He did so with certainty. Indeed, describing the identification at the hospital, the prosecutor stated in her closing argument: "He was very sure who shot him." The certainty factor in CALCRIM No. 315 invited the jury to infer a direct relationship between the certainty of this identification and its accuracy despite the fact that "[t]here is near unanimity in the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' [Citations.]" (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) This was error. However, unlike *Lemcke*, "where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant" (*id*. at p. 666), here: Bledsoe knew defendant before the shooting; Bledsoe's identification of defendant was corroborated by the cell

10

phone video depicting defendant shooting the same gun Bledsoe described being shot with; GPS coordinates led police to the field where defendant fired that gun in the video; and shell casings recovered from that field matched the shell casings left behind at Bledsoe's apartment. In light of this strong corroborating evidence, we conclude there is no reasonable likelihood the result of the proceeding would have been different had the jury not been instructed to consider Bledsoe's level of certainty in identifying defendant as the shooter.

Finally, we also reject defendant's assertion that instructing on the certainty factor violated his federal constitutional right to due process. Indeed, as mentioned, *Lemcke* rejected this very argument. As our Supreme Court explained in that case, instructing the jury to consider the level of certainty with which an identification was made does not lower the prosecution's burden of proof or deprive a defendant of the opportunity to present a complete defense. (*Lemcke*, *supra*, 11 Cal.5th at pp. 657-661.)

In sum, we conclude defendant's failure to object to the challenged instruction forfeits this issue on appeal because the error did not affect defendant's substantial rights. Instead, the error was harmless under the state law standard for assessing prejudice and did not amount to a violation of defendant's federal constitutional rights.

## III

### *Sentencing Errors*

Defendant further asserts several sentencing errors occurred. We address each assertion in turn and conclude the matter must be remanded for resentencing.

### A.

### *Imposition of the $850 Fine on a Stayed Sentence*

Defendant argues we must strike a fine of $850 imposed by the trial court pursuant to section 672 with respect to count 1 because the trial court stayed the sentence on that

11

conviction. The Attorney General concedes the error. We accept the concession. When a sentence on a conviction has been stayed, that conviction may not be used for any punitive purpose, including the imposition of fines. (See, e.g., *People v. Sencion* (2012) 211 Cal.App.4th 480, 483; *People v. Carlson* (2011) 200 Cal.App.4th 695, 710.) Because we are remanding based on *High*[3] error, as we explain later in the opinion, we shall direct the trial court to refrain from imposing this fine during resentencing.

## B.

### *Penalty Assessments Added to Laboratory Analysis and Drug Program Fees*

Defendant also argues we must strike penalty assessments the trial court ordered added to the $50 laboratory analysis fee (Health & Saf. Code, § 11372.5) and $150 drug program fee (*id.*, § 11372.7) imposed upon defendant's narcotics conviction, relying on three intermediate appellate decisions (*People v. Watts* (2016) 2 Cal.App.5th 223 (*Watts*); *People v. Moore* (2015) 236 Cal.App.4th Supp. 10 (*Moore I*); *People v. Vega* (2005) 130 Cal.App.4th 183 (*Vega*)) in support of the argument that these "fees" do not constitute "punishment" subject to additional penalty assessments. However, in *People v. Moore* (2017) 12 Cal.App.5th 558 (*Moore II*), we reversed the appellate division's decision in *Moore I* and held these fees are indeed "punishment" subject to additional penalty assessments.[4] (*Moore II,* at pp. 563-567.) In so holding, we rejected contrary conclusions reached in *Vega* and *Watts*. (*Moore II,* at pp. 568-571.) We perceive no

---

**3**     *People v. High* (2004) 119 Cal.App.4th 1192 (*High*).

**4**     Our Supreme Court ordered further action "deferred pending consideration and disposition of a related issue in *People v. Ruiz,* S235556." The opinion in *People v. Ruiz* issued May 17, 2018. (*People v. Ruiz* (2018) 4 Cal.5th 1100 (*Ruiz*).) Our decision in *Moore II* was vacated July 30, 2018, and another decision issued. (*People v. Moore* (Sept. 14, 2018, C079171) [nonpub. opn.].)

12

reason to reconsider this holding and reject defendant's argument for the reasons expressed in *Moore II*.

Indeed, our conclusion in *Moore II* is confirmed by our Supreme Court's decision in *Ruiz, supra,* 4 Cal.5th 1100, holding the laboratory analysis and drug program fees constitute "punishment" within the meaning of section 182. In so holding, the court "reject[ed] *Watts*'s anomalous conclusion that the criminal laboratory analysis fee 'is by its nature not punishment and therefore not a "fine" or "penalty" except,' as the second paragraph of [Health and Safety Code] section 11372.5, subdivision (a), specifies, 'in the case of an offense "for which a fine is not authorized by other provisions of law." ' " (*Ruiz*, *supra*, at p. 1113, quoting *Watts*, *supra*, 2 Cal.App.5th at p. 235.) The court also rejected both *Vega*'s "assertion . . . that 'the main purpose' of [Health and Safety Code] section 11372.5 'is not to exact retribution against drug dealers or to deter drug dealing . . . but rather to offset the administrative cost of [drug] testing,' " and the defendant's "similar argument regarding [Health and Safety Code] section 11372.7, asserting that the 'fundamental purpose' of the drug program fee 'is to offset' the cost of certain government programs." (*Ruiz* at p. 1119, quoting *Vega*, *supra*, 130 Cal.App.4th at p. 195.)

Because the laboratory analysis fee and drug program fee constitute punishment, the trial court properly imposed additional penalty assessments in connection with those fees.

In the alternative, defendant argues the drug program fee must be reduced to $185. Not so. The sentencing minute order reflects the trial court imposed a total fine of $585 pursuant to Health and Safety Code section 11372.7 "as broken down in the probation report." The abstract of judgment provides the breakdown as reflected in the probation report: "Pay a $150 Drug Program fee per HS §11372.7(a), a $30 Court Surcharge per

13

PC §1465.7, a $75 State Court Facilities Construction Fund fee per GC §70372(a), a $150 State Penalty Assessment per PC §1464, a $15 DNA Identification Fund fee per GC §76104.6, a $60 DNA Identification Fund fee per GC §76104.7 and a $105 County Penalty Assessment per GC §76000 for a total of $585.00." However, as defendant accurately notes, the reporter's transcript reflects that the trial court orally imposed a "$185 drug program fee, pursuant to Health and Safety Code [section] 11372.7 for Count IV, that includes penalty assessments."

"Entering the judgment in the minutes being a clerical function [citation], a discrepancy between the judgment as orally pronounced and as entered in the minutes is *presumably* the result of clerical error. Nor is the abstract of judgment controlling. 'The abstract of judgment is not the judgment of conviction. By its very nature, definition and terms [citation], it cannot add to or modify the judgment which it purports to digest or summarize.' [Citation.]" (*People v. Mesa* (1975) 14 Cal.3d 466, 471-472, italics added.) However, "whether one portion of the record should prevail against the contrary statements in another portion of the record will depend on the circumstances of each particular case." (*People v. Harrison* (2005) 35 Cal.4th 208, 226.) Here, the trial court either misspoke when it imposed a drug program fee in an unauthorized amount of $185, or the court reporter erred in transcribing the court's imposition of the fee plus penalty assessments. Because we are remanding based on *High* error (*High, supra,* 119 Cal.App.4th 1192), as we explain immediately below, we shall also direct the trial court to impose the drug program fee plus penalty assessments in the correct amount of $585.

## C.

### High *Error*

Defendant further argues we must remand the matter to the trial court with directions to separately list, with the statutory basis, all fines, fees and penalties imposed

14

on each count. Specifically, in pronouncing judgment, the trial court ordered defendant to pay "a fine of $850, pursuant to [section] 672 of the Penal Code with penalty assessment" for counts 1 and 2, and a fine of "$460, pursuant to [section] 672 of the Penal Code, including penalty assessments" for count 3. The minute order and abstract of judgment reflect these total amounts without setting forth a breakdown of the statutory authority for the penalty assessments.

In *High*, *supra*, 119 Cal.App.4th 1192, we stated: "Although we recognize that a detailed recitation of all the fees, fines and penalties on the record may be tedious, California law does not authorize shortcuts. All fines and fees must be set forth in the abstract of judgment. [Citations.] The abstract of judgment form used here, Judicial Council form CR-290 (rev. Jan. 1, 2003) provides a number of lines for 'other' financial obligations in addition to those delineated with statutory references on the preprinted form. If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency. [Citation.] At a minimum, the inclusion of all fines and fees in the abstract may assist state and local agencies in their collection efforts. [Citation.]" (*Id*. at p. 1200.)

Here, the probation report provided the following breakdown of the section 672 fines. The $850 total fine imposed for counts 1 and 2 was comprised of a $200 fine pursuant to § 672, plus a $40 Court Surcharge (§ 1465.7), a $100 State Court Facilities Construction Fund fee (Gov. Code, § 70372, subd. (a)), a $200 State Penalty Assessment (§ 1464), a $20 DNA Identification Fund fee (Gov. Code, § 76104.6), a $80 DNA Identification Fund fee (Gov. Code, § 76104.7), a $140 County Penalty Assessment (Gov. Code, § 76000), a $30 Court Operations Assessment (§ 1465.8), and a $40 Conviction Assessment Fee (Gov. Code, § 70373). The same breakdown was provided

15

for count 3, except the $850 total was crossed out and replaced with $460 without explanation. As in *High*, we shall remand the matter to the trial court with directions to "separately list, with the statutory basis, all fines, fees and penalties on each count." (*High*, *supra*, 119 Cal.App.4th at p. 1201.) As we have already explained, because the $850 fine was improperly imposed on count 1, we shall also direct the trial court to refrain from imposing this fine on remand. And with respect to count 3, because the breakdown of penalty assessments listed in the probation report does not add up to $460, the trial court is further directed to provide an accurate breakdown of such penalty assessments.

## IV

### *Retroactivity of Senate Bill 620*

Defendant additionally claims we must remand the matter for a new sentencing hearing because Senate Bill 620, which became effective January 1, 2018, and amends sections 12022.5 and 12022.53 to give the trial court discretion to strike firearm enhancements in the interest of justice, applies retroactively to cases not yet final on appeal.

Defendant was sentenced on July 15, 2015. The law at that time did not allow the trial court to strike his firearm enhancements in the interest of justice, but rather required their mandatory imposition. (See former §§ 12022.5, subd. (c), 12022.53, subd. (h); Stats. 2010, ch. 711, § 5.) Senate Bill 620 amended both sections to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, §§ 1 & 2.)

16

Relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), defendant argues the amendments to these sections apply to him because his judgment is not yet final. In *Estrada*, our Supreme Court stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Id*. at p. 745.) This includes "acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Ibid*.) Thus, under *Estrada*, absent evidence to the contrary, we presume the Legislature intended a statutory amendment reducing punishment to apply retroactively to cases not yet final on appeal. (*Id*. at pp. 747-748; *People v. Brown* (2012) 54 Cal.4th 314, 324.) Our Supreme Court has also applied the *Estrada* rule to amendments giving the trial court discretion to impose a lesser penalty. (*People v. Francis* (1969) 71 Cal.2d 66, 76.)

Defendant argues, "although the new provision here does not guarantee a reduced sentence, the *Estrada* rule applies nonetheless," requiring remand to the trial court for resentencing. The Attorney General concedes the rule of *Estrada, supra,* 63 Cal.2d 740 requires retroactive application of Senate Bill 620 to defendant's case, but argues remand is nevertheless unnecessary, relying on *People v. Gutierrez* (1996) 48 Cal.App.4th 1894. We accept the concession, and also find persuasive the Attorney General's reliance on *Gutierrez* to avoid remand for this purpose. There, our colleagues at the Second Appellate District declined to remand the defendant's matter for resentencing despite the fact the trial court erroneously believed it lacked discretion to strike his prior strike conviction under the three strikes law. As the court explained, "the trial court indicated

17

that it would not, in any event, have exercised its discretion to lessen the sentence" and therefore "no purpose would be served in remanding for reconsideration." (*Id*. at p. 1896.)

Here, while the trial court had no discretion to strike the firearm enhancement at the time it was imposed, it also stated that enhancement term was "appropriate[]." The trial court then reviewed factors in aggravation, including "the crime involved great violence disclosing a high degree of cruelty, viciousness, and callousness. The victim was particularly vulnerable. The manner in which the crime was committed indicates planning, sophistication, and professionalism. Defendant engaged in conduct that indicated a serious danger to society. His prior convictions as an adult are numerous or of increasing seriousness. He was on probation when the crime was committed. His prior performance on probation was unsatisfactory." While the trial court recounted these factors in aggravation in the context of imposing an upper term sentence for possession of a firearm by a convicted felon, and it is possible to find a preponderance of aggravating factors for that purpose while also concluding a firearm enhancement should be stricken in the interest of justice, here, the trial court's comment that the enhancement term was "appropriately require[d]" adds weight to a conclusion that term would not have been stricken had the trial court possessed such discretion at the time of sentencing.

We therefore need not remand the matter for an exercise of discretion regarding whether or not to strike defendant's firearm enhancement in the interest of justice.

## V

### *Retroactive Application of Senate Bill 136*

Finally, in a supplemental brief filed following our Supreme Court's transfer of the cause back to this court, defendant argues his prior prison term enhancement must be

stricken because Senate Bill 136 also applies retroactively to cases not yet final on appeal and eliminates this enhancement for defendant's prior crime. We agree.

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b), to remove the one-year enhancement for prior prison terms, except when the offense underlying the prior prison term was a sexually violent offense. (See § 667.5, subd. (b).) Because Senate Bill 136 reduces sentences for a crime it applies retroactively to convictions not final on appeal absent evidence of a contrary legislative intent. (See *People v. Brown* (2012) 54 Cal.4th 314, 323-324; *Estrada, supra,* 63 Cal.2d at p. 745.) The enactment therefore applies to this case.

The offense underlying defendant's prior prison term was not a sexually violent offense. Accordingly, the prior prison term enhancement cannot stand.

### DISPOSITION

Defendant's convictions are affirmed. The prior prison term enhancement is stricken and the matter is remanded to the trial court with directions to (1) refrain from imposing any fines on stayed counts, (2) impose the drug program fee plus penalty assessments in the correct amount of $585, and (3) separately list, with the statutory basis, all fines, fees and penalties on each count. The trial court is further directed to prepare a new abstract of judgment and to forward a certified copy of the abstract to the Department of Corrections and Rehabilitation.

            /s/                          
HOCH, J.


We concur:


 /s/                               
RAYE, P. J.


 /s/                               
MURRAY, J.