Filed 4/14/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | B318794 |
| _____ | Los Angeles County Super. Ct. No. 20CCJP00196B |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KARLA S., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Juvenile Court Referee. Conditionally reversed and remanded with directions.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

At the behest of tribes seeking redress for a long and troubled history, the Legislature enacted a statute to help them identify children who could sustain tribal cultures.  But an agency skipped the low-cost measures the statute required.  That neglect shuts tribes out:  they cannot learn about cases where their interests can be vitally at stake.  The agency's disregard defeats the statute's promise, and this broken promise is a miscarriage of justice.  It prejudices tribes.

## I

### A

The lone issue is the federal Indian Child Welfare Act, sections 1901 and following of title 25 of the United States Code (the Act, or ICWA) and its California counterpart.  (Welf. & Inst. Code, § 224 et seq.)

The word "Indian" appears in official statutory titles and content.  (E.g., Welf. & Inst. Code, § 224.1, subd. (a) [defining "Indian," "Indian child," "Indian custodian," and "Indian tribe"].)

Controversy surrounds this word.  (E.g., Wikipedia, Native American name controversy, <https://en.wikipedia.org/wiki/ Native_American_name_controversy> [as of April 12, 2023], archived at < https://perma.cc/W8MM-ELEC>.)

Because statutory text and categories are at the center of this statutory case, clarity sometimes necessitates using the legislative word "Indian."

## B

In May 2021, the Department of Children and Family Services detained infant boy S.S. at birth, based on exigency, alleging his parents abused drugs and S.S. was born testing positive for opiates, amphetamines, and methamphetamines. The Department was familiar with these parents: the juvenile court already had made S.S.'s older brother N.S. a dependent of the court.

Three of S.S.'s paternal relatives are central to this appeal: S.S.'s grandfather O.H., aunt L.R., and cousin L.T.

The Department had contact information for all three paternal relatives.

The record contains the Department's contact information for this grandfather and aunt. Presumably the Department also had contact information for this cousin, for it reported the cousin had custody of S.S.'s brother N.S., who was under the Department's supervision. The father said he wanted the Department to place S.S. with this cousin.

In May 2021, the juvenile court detained S.S. from his parents and placed him with his *maternal* aunt and uncle. The juvenile court conducted jurisdictional and dispositional hearings and, on September 21, 2021, ruled that S.S. was a dependent of the court.

The mother and father both denied Indian ancestry.

The maternal aunt, however, said that the mother might have Yaqui heritage and that the maternal grandmother would know more. The maternal grandmother did know more: she said a DNA ancestry search, as well as information from relatives, made her think she had Yaqui ancestry through the maternal great-grandfather. The court ordered the Department to

3

interview the maternal aunt and grandmother. The Department in turn notified the Pascua Yaqui tribe, which replied S.S. was not eligible for membership: the tribe would not intervene.

The Department never asked *paternal* extended family members about the possibility of Indian ancestry. The Department concedes this point.

Although the Department had contact information for three paternal extended family members and never asked them about Indian ancestry, the court found the Act inapplicable in September 2021. The court ruled there was no reason to know S.S. was an Indian child.

In 2022, the court terminated parental rights in favor of a permanent plan of adoption by the maternal aunt and uncle who were the caretakers and prospective adoptive parents. The mother appealed.

## II

The crucial statute is the amendment to section 224.2 of the Welfare and Institutions Code, enacted in 2018 and effective January 1, 2019. (Stats. 2018, ch. 833 (A.B. 3176), § 5.)

This 2018 amendment requires conditional reversal and a remand for the Department to ask the three extended paternal family members for whom the Department had contact information whether S.S. may have Indian ancestry. This work should be slight and swift. The slightness of the effort, however, does not imply the effort is unimportant. To the contrary, the effort is *vital* to tribes striving to locate children to sustain tribal cultures. We reverse and remand for the Department to conduct this vital work that would take so little effort.

The analysis just stated does not command unanimous agreement in the California Courts of Appeal, to put it mildly.

4

These courts are amazingly divided on the proper way to handle the 2018 amendment.  (E.g., *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 [critically surveying widely divergent approaches].)  Indeed, it is emblematic of this diversity of opinion that in this very case we have three opinions from three judges.

Our Supreme Court will review this issue.  (*In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578.)

Pending guidance from the high court, the controversy is sharp.

Across this riven appellate field, there can be earnest and heartfelt opposition to allowing ICWA issues to delay agency efforts to finalize children's adoptions.  One perspective senses overwhelming futility in this whole and maddeningly persistent debate, given the slight likelihood that any real good will come from the ICWA rigamarole.  The children, who have heartrending needs for immediate, stable, and loving adoptions, are at the center of the proceedings; their circumstances are vivid and their precious formative years fleeting.  By contrast, "tribes" can seem faraway abstractions—they are nowhere to be seen or heard in these cases and courts—and ancient injustices to tribes may seem remote and hardly the fault of hardworking social workers or the high-minded and committed bench officers trying to solve today's dire problems.

From this perspective, ICWA can seem like pointless make work:  a costly diversion of resources from a vital mission understaffed in the first place.  Moreover, the issue often bursts forth only on appeal, only after years of silence, only after extended and evident disinterest in the matter.

There can be suspicion the whole controversy is just made up, on behalf of parents who have no connection to indigenous culture—that the entire thing is but a cynical ploy for delay.

Another perspective is possible. Here, a different view proceeds in five steps:

1. Legislative history shows tribes are the real parties in interest, and tribes have explained why asking only parents is not enough.

2. The 2018 amendment's requirement of communicating with extended family members is not some costly new mandate; rather, it usually piggybacks economically on the Department's preexisting duty and current practice of investigating extended family members.

3. The added effort here would have been slight, which accords with legislative intent: the 2018 amendment should not cause a workload increase for county caseworkers.

4. Courts properly interpret the concept of prejudice under the 2018 amendment in light of its legislative purpose of redressing a long and troubling history we should not forget.

5. Tribes suffer prejudice when the Department had contact information for extended paternal family members but did nothing with it, thus denying tribes the benefit of the 2018 statutory promise.

A

Tribes are the real parties in interest under this statute.

The 2018 amendment imposed a duty the federal Act does not. That new state duty requires the Department and similar

6

agencies to ask "extended family members" whether a child has Indian ancestry.  (Welf. & Inst. Code, § 224.2, subd. (b).)  By statute, then, *asking only the parents is not enough.*

This 2018 amendment was tribal in origin and purpose.

By way of summary, California tribal leaders gathered narratives and data about the failure of implementation of the Act.  They issued a report that generated the 2018 amendment: the Legislature embraced the tribal proposal swiftly and without opposition.  The resulting law required the Department to ask "extended family members" whether the child may be an Indian child.

Let us flesh out this summary by tracing the law's origin and purpose in more detail.

The 2018 amendment originated in a 2017 report by the ICWA Compliance Task Force.  (See California ICWA Compliance Task Force, Report to the California Attorney General's Bureau of Children's Justice, 2017 [as of Feb. 1, 2023], archived at <https://perma.cc/NYF6-VPY9> (Tribal Report).)

"In November 2015, the California Department of Justice's Bureau of Children's Justice created the first ICWA Compliance Task Force in California.  The Task Force was independent of the Department of Justice, made up of tribal representatives and advocates, and operates under the direction of tribal leadership. Its purpose was to gather information and data to inform the Bureau of Children's Justice of the status of compliance with California laws related to Native American children in California, and provide recommendations regarding changes necessary to decrease violations of these laws across the many state and county systems that impact tribal families in the dependency system.  The Task Force's work culminated in a 2017 Report to

7

the California Attorney General's Bureau of Children's Justice. Subsequent to the Task Force, the [California Tribal Families Coalition] was created, which is the sponsor of this measure." (Cal. Health and Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.) prepared for Governor Brown (Aug. 31, 2018 & Sept. 4, 2018) p. 5 (Enrolled Bill Report).)

This information is from an enrolled bill report. These reports instruct us about legislative purpose and effect. Government departments write these reports to help the Governor decide whether to sign the bill into law—a necessary and final step in the legislative process. The departmental authors usually write their reports within days of the statute's passage. (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1111, fn. 3.) These reports thus can be a relevant and synoptic view of an enrolled bill the Governor signs into law; they encapsulate the bill to help the Governor decide its fate.

Returning to the Tribal Report, it explained why relying on parents alone for the initial inquiry does not necessarily protect the rights of the tribe. (Tribal Report, *supra*, p. 28.)

"*When parents are the sole target of the initial inquiry*, it should be understood that there are a variety of reasons why *relying on the parents does not necessarily protect the child's best interests, or the rights of the tribe.* Parents may simply not have that information, or may possess only vague or ambiguous information. [¶] The parents or Indian custodian may be fearful to self-identify, and social workers are ill-equipped to overcome that by explaining the rights a parent or Indian custodian has under the law. Parents may even wish to avoid the tribe's

8

participation or assumption of jurisdiction." (Tribal Report, *supra*, p. 28, fns. omitted, italics added.)

To the extent the law has been interpreted to restrict inquiry to parents, the Tribal Report explained, "it should be amended." (Tribal Report, *supra*, p. 27.)

This case illustrates that point: extended family members can have tribal information the parents lack, or have forgotten, or refuse to divulge. As recounted above, S.S.'s mother denied having Indian ancestry, but her extended relatives had more information: the maternal aunt reported the possibility of Yaqui ancestry and said the maternal grandmother would know more. This grandmother did know more, from a DNA test as well as from other relatives. Had the Department never asked these *maternal* extended family members, this possible Yaqui ancestry would have remained hidden. This illustrates why tribes sought inquiry beyond the parents alone. This inquiry successfully revealed information then transmitted to Yaqui authorities, who made a sovereign decision about S.S. That served the purpose of the 2018 amendment: the tribe was notified and had an opportunity to be heard. The law and its mandated inquiry allowed the tribe to be part of the process.

Further illustrating the tribal origin of the 2018 amendment is the fact that the California Tribal Families Coalition was the amendment's sponsor and source. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] April 17, 2018, pp. 1 & 10.)

What is this Coalition?

The Coalition "was formally organized in May 2017 to continue to press for the implementation of the Task Force 2017 Report recommendations. The [Coalition] Board of Directors is

9

comprised of thirteen Tribal Council leaders from across the State, including five of the seven co-chairs of the Task Force.  [¶] The [Coalition] is organized as a 501(c)(4) nonprofit membership corporation to promote social welfare, and to promote and protect the health and welfare of tribal children and families through litigation, legislation, regulations, and policy initiatives.  The initial road map for the organization lies in the recommendations contained in the Task Force Report.  The [Coalition] Board of Directors has established a multi-pronged approach to advance its mission which includes:  regional meetings of tribal social workers and ICWA advocates; convening an attorney advisory panel of tribal attorneys in the state; and the establishment of the Children's Commission, a high-level executive body of tribal leaders, judges, and subject matter experts to provide the Board of Directors with a broad perspective and recommendations to better protect the health, safety and welfare of tribal children and families."  (Enrolled Bill Report, *supra*, p. 6; see also California Tribal Families Coalition <https://caltribalfamilies. org/> [as of April 12, 2023], archived at <https://perma.cc/NC9Z-2AGM> ["The California Tribal Families Coalition was established by tribal leaders from across the state to provide a strong and unified voice on behalf of tribal children.  Formed in 2017 to implement the comprehensive findings of the California ICWA Compliance Task Force, CTFC has worked with its member tribes to successfully pass key legislation that helps protect Native children and tribal sovereignty . . . ."].)

So, tribes wrote a report demanding legislative action, and the California Tribal Families Coalition sponsored a bill and pressed for its passage.  The California Legislature passed the bill swiftly, and the Governor signed it straight away.  There was

10

no opposition.  (Sen. Rules Com., Report on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] August 20, 2018, p. 8.)  The votes at every stage were unanimous.  (Enrolled Bill Report, *supra*, at p. 8; see also History of AB-3176 Indian children, <https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=201720180AB3176> [as of April 12, 2023], archived at <https://perma.cc/48UG-X8SR>.)

In sum, this uncontroversial law was tribal in origin and purpose.  Tribes are the real parties in interest in cases applying the 2018 amendment.

B

Investigating "extended family members" is a well established and familiar duty for agencies like the Department.  (See *In re K.H.*, *supra*, 84 Cal.App.5th at p. 619.)  By long-standing practice, the Department routinely searches for and communicates with a child's extended family members—for reasons that existed before the 2018 amendment.

The simple and compelling idea is that it might be good to place a child within a family structure, and to do that you must learn about the family structure.

Under the statute at hand, extended family members include the child's stepparents, grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins.  (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).)

Predating the 2018 amendment and apart from a tribal purpose, many different laws have required the Department to identify and to contact extended family members, simply to carry out the Department's day-to-day work.  (E.g., Welf. & Inst. Code, §§ 300.2 [focus shall be on the preservation of the family], 309

11

[social worker shall immediately investigate the circumstances of the child and attempt to maintain the child with the child's family], 358 [court shall make a finding as to whether the social worker has exercised due diligence in conducting the investigation to identify, locate, and notify the child's relatives], 361.3 [preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative], 361.4 [the county welfare department shall conduct an in-home inspection to assess the ability of the relative or nonrelative extended family member to care for the child's needs], 361.45 [when sudden unavailability of a foster caregiver requires a change in placement, if a relative or a nonrelative extended family member is available and requests temporary placement of the child, the county welfare department shall assess that person's suitability], 366.22 [requiring a review of contact between children and their parents and other members of the extended family].)

The 2018 amendment in most cases requires the Department—when performing this routine duty—simply to add a topic to the agenda in these already-occurring investigations. This topic is "to inquire whether that child is an Indian child." (Welf. & Inst. Code, § 224.2.) The Department must ask "whether the child is, or may be, an Indian child . . . ." (*Ibid.*)

In short, the 2018 amendment's basic mandate of communicating with extended family members does not require some novel and expensive departure for the Department. The amendment instead merely adds an item to the Department's preexisting duty of investigating extended family members.

12

## C

The 2018 amendment required added agency effort that here is *slight*. For instance, when you already are having or planning a conversation, how long does this additional question take: "Might this child be an Indian child?"

The slightness of this burden accords with the 2018 amendment.

The legislative history states the 2018 amendment "should not significantly change the administrative work required of county agencies and caseworkers . . . ." (Enrolled Bill Report, *supra*, p. 3

The fiscal impact of the 2018 amendment would be "None. *This bill would not result in a workload increase for a county caseworker*." (Enrolled Bill Report, *supra*, p. 7, italics added.)

Nowhere in the legislative history is there any indication that legislators anticipated or wanted the 2018 amendment to require child welfare agencies like the Department to embark on significantly expensive or time-consuming new investigations to find extended family members simply to ask about Indian ancestry.

Early in the legislative process, there was uncertainty about the bill's fiscal impact. (E.g., Assem. Com. on Human Servs., Rep. on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] April 10, 2018, pp. 7 ["FISCAL EFFECT: Unknown."].) Elsewhere, legislative analysts estimated a likely cost increase from providing "all case file information to all tribes that acknowledge that they are the child's tribe, from providing services such as qualified expert witnesses, and from developing emergency proceedings required by the bill." (Assem. Com. on Approps, Rep. on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] May 23, 2018, p.

1.)  Another possible cost was to conform with the new federal standards.  (Sen. Rules Com., Report on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] August 23, 2018, p. 6.)  Any costs would be "minor and absorbable."  (Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 3176, [2017-2018 Reg. Sess.], August 12, 2018, p. 2.)

All these estimates are consistent with the statement that "*[t]his bill would not result in a workload increase for a county caseworker*."  (Enrolled Bill Report, *supra*, p. 7, italics added.)

Some have rightly decried a "*limitless* inquiry into whether a child might be an Indian child."  (*In re A.C.* (2022) 86 Cal.App.5th 130, 137, italics added [dis. opn. of Baker, J.]; see also *id*. at p. 141 ["How is a court or social services agency to decide who else has an interest in a child such that ICWA-related questions must be posed?  Do family friends qualify?  Therapists?  Pastors?  Teachers?  Coaches?  Doctors?  Dentists?"]; *In re K.H.*, *supra*, 84 Cal.App.5th at pp. 591 fn. 6, 602–603.)

Limitless inquiries consume scarce resources otherwise devoted to the pressing needs of children and families.  (See *In re H.V.* (2022) 75 Cal.App.5th 433, 441 [dis. opn. of Baker, J.] ["ordering a child services agency to try to run down suggestions of possible Indian heritage has real costs to the agency's core mission of keeping children healthy and safe—there are only so many hours in a day and only so many child services agency employees on the payroll"].)

Courts should not interpret the 2018 amendment as creating a limitless or even a significantly burdensome new duty.  (See *In re K.H.*, *supra*, 84 Cal.App.5th at pp. 603–604.)  That would be contrary to the Legislature's intent.

By the same token, courts also, and rightly, caution appellants against "repeated appeals on this issue," which would be "to the detriment of all and would come at an intolerably high cost to the child's interest in permanency and stability." (*In re K.H.*, *supra*, 84 Cal.App.5th at p. 620.)

The Legislature's intent thus was that agency caseworkers ask an added question of extended family members whom caseworkers often already are investigating in their usual course of work. That added question is whether the child may be an Indian child. Courts should interpret the 2018 amendment in light of this legislative intent.

D

When considering the 2018 amendment, the California Legislature was aware of the "*long and troubling history* of separation of Native American children from their families and their tribes . . . ." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3176 [2017-2018 Reg. Sess.] April 17, 2018, p. 1, italics added; cf. *In re K.H.*, *supra*, 84 Cal.App.5th at pp. 588–590 [ICWA is a *remedial* statute].)

Courts should interpret the 2018 amendment in light of its legislative purpose. (E.g., *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135 [fundamental task is to ascertain the intent of the lawmakers so as to effectuate the statute's purpose].)

This purpose shows that, although costs may be slight, the payoff can be large for tribes, whose children carry their cultures into the future. The inquiry required by the 2018 amendment is vital—literally: it can help keep cultures alive. This inquiry indispensably serves the goal of preserving and transmitting native cultures because there is a chance extended family

15

members may have otherwise-unavailable information the child has Indian ancestry.

Admittedly, and in all likelihood, the chance of discovering a child with Indian ancestry is *very small*, for historical reasons.

Those historical reasons go right to the heart of the issue.

Before surveying those historical reasons, it is helpful to recall that courts consider whatever materials are appropriate in construing statutes. (Cal. Law Revision Com. com., West's Ann. Cal. Evid. Code (2022 ed.) foll. § 450; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 775, fn. 5.)

For instance, courts must be familiar with legislative facts about American history. Legislative facts, like whether George Washington was our first president, are fundamentally different from adjudicative facts, like whether a party did or did not run a red light.

Courts commonly consult historical sources to gain understanding. (E.g. *McGirt v. Oklahoma* (2020) 140 S.Ct. 2452, 2463–2473 [citing historical works to comprehend Native American history]; *id.* at p. 2483 [dis. opn. of Roberts, C.J.] [same].)

No material from a case record is needed to know, for instance, that indigenous people were here before Europeans arrived, or, for that matter, that Juan Rodríguez Cabrillo landed in California in 1542. (See Weber, The Spanish Frontier in North America: The Brief Edition (2009) p. 34 (Frontier).)

We likewise know that, today, the odds that a given child has Indian ancestry are *very small*. (Cf. *In re K.H., supra*, 84 Cal.App.5th at pp. 590, 619 [vast majority of inquiries will not locate an Indian child].)

The chance is very small because, in the California of the modern era, the demographic percentage of Native Americans is very small. (Starr, California: A History (2005) p. 318 (hereafter California) [American Indian and Alaska Native individuals made up 0.5% of California population according to Census 2000].)

The fact this percentage is very small today represents enormous change. Five centuries ago—before Cabrillo came—100% of the people living in California had indigenous heritage.

There are many reasons for this precipitous decline from 100% to a very small percentage.

There is a long and troubling history.

"From Native American viewpoints, Europeans came as predators. . . . To indigenous peoples . . . it must have seemed inconceivable Europeans had discovered them or had a right to push into their lands and claim sovereignty over them. . . . As Spaniards moved into lands almost invariably occupied by natives, the first meetings between discoverer and discovered were brutal." (Frontier, *supra*, p. 26-28.)

Theodore Roosevelt said, "I don't go so far as to think that the only good Indians are dead Indians, but I believe nine out of every ten are, and I shouldn't like to inquire too closely into the case of the tenth." (Dyer, Theodore Roosevelt and the Idea of Race (1980) p. 86.)

Roosevelt's comment reflected a history of deadly attacks on tribes. (E.g., Hedgpeth, *This was the worst slaughter of Native Americans in U.S. history. Few remember it.*, <https://www.washingtonpost.com/history/2021/09/26/bear-river-massacre-native-americans-shoshone/> [as of April 12, 2023], archived at < https://perma.cc/UE3U-HN7Y>.)

17

The pre-contact prophecy of a Spokan Indian was this: " 'Soon,' warned the prophet, 'there will come from the rising sun a different kind of man from any you have yet seen, who will bring with them a book and will teach you everything, and after that the world will fall to pieces.' " (Calloway, New Worlds For All: Indians, Europeans, and the Remaking of Early America p. xiii (2d ed. 2013) (New Worlds).)

From indigenous perspectives, the prophecy came true.

California's state librarian wrote that "first Europe and then the United States invaded their lands, wiped out their food supply, uprooted their culture, and decimated their numbers. After twenty-five generations, the First Californians would soon be encountering social forces, diseases, and genocidal violence that would bring them to the brink of extinction." (California, *supra,* p. 16.)

A multitude of other accounts describe this long and troubling history.  [E.g., Kroeber, Ishi in Two Worlds:  A Biography of the Last Wild Indian in North America (1961) pp. 40–114 [recounting the extinction of the Yana, down to the final survivor, Ishi]; Brown, Bury My Heart At Wounded Knee: An Indian History of the American West (1970) p. 449 [quoting Red Cloud:  "They made us many promises, more than I can remember, but they never kept but one; they promised to take our land, and they took it"]; Phillips, The Enduring Struggle: Indians in California History (1990) pp. 14–78; Phillips, Indians and Intruders in Central California, 1769-1849 (1993) pp. 32–165; Rawls, Indians of California: The Changing Image (1984) pp. 171–201; Fagan, Before California:  An Archaeologist Looks at Our Earliest Inhabitants (2003) pp. 357–361; Frontier*, supra, passim*; New Worlds*, supra, passim*.)

A more specific and relevant history likewise describes interference with tribal children. A continent-wide program removed tribal children by force. Tribes have known about this program. Tribes were direct victims for a century and a half.

The federal government conceived of Indian schools as an alternative to warfare against tribes. A goal was the cultural assimilation of Indian children. (Fear-Segal & Rose, Carlisle Indian Industrial School: Indigenous Histories, Memories, & Reclamations pp. 6–7 (2016) (Carlisle); Davis, *American Indian Boarding School Experiences: Recent Studies from Native Perspectives*, (Winter 2001), OAH Magazine of History, at pp. 20-22.)

The federal government embraced the Indian school program partly because it was more economical than military warfare against tribes. "The rationale for choosing cultural rather than physical genocide was that it was more humane as well as economically pragmatic. Secretary of the Interior Schurz concluded that it would cost a million dollars to kill an Indian in warfare, whereas it cost only $1,200 to school an Indian child for eight years." (Carlisle, *supra*, p. 7.)

The founder of the Indian school program identified his ambition: "Kill the Indian in him, and save the man." (R.H. Pratt, Speech to the Proceedings of the National Conference of Charities and Correction, June 23-29, 1892, p. 46, <https://carlisleindian.dickinson.edu/sites/default/files/docs-resources/CIS-Resources_1892-PrattSpeech.pdf> [as of April 12, 2023], archived at < https://perma.cc/EAL5-BCGH>.) The goal was to "plant[] treason to the tribe and loyalty to the nation at large." (*Id.* p. 57.)

19

A federal report summarizes recent investigation by the United States Department of the Interior. (Federal Indian Boarding School Initiative Investigative Report (May 2022), <https://www.bia.gov/sites/default/files/dup/inline-files/bsi_investigative_report_may_2022_508.pdf> [as of April 12, 2023], archived at < https://perma.cc/FF4L-W6X6> (Indian School Report); see also U.S. Dept. Interior, Federal Indian Boarding School Initiative, < https://www.bia.gov/service/federal-indian-boarding-school-initiative> [as of April 12, 2023], archived at <https://perma.cc/FW4A-P4FW> (Indian School Initiative).)

"[F]rom 1819 to 1969, the federal Indian boarding school system consisted of 408 federal schools across 37 states or then territories . . . ." (Indian School Initiative.) The Federal government created Indian schools throughout the nation, including in the American West. Twelve schools were in California, 48 in Arizona, three in Nevada, 10 in Oregon, 15 in the State of Washington, and 45 in New Mexico. (Indian School map, pp. 8, 6, 31, 40, 50, and 34, respectively, <https://www.bia.gov/sites/default/files/dup/inline-files/appendix_c_school_maps_508.pdf> [as of April 12, 2023], archived at < https://perma.cc/V6MS-23JA>.)

"Systematic identity-alteration methodologies employed by Federal Indian boarding schools included renaming Indian children from Indian names to different English names; cutting the hair of Indian children; requiring the use of military or other standard uniforms as clothes; and discouraging or forbidding the following in order to compel them to adopt western practices and Christianity: (1) using Indian languages, (2) conducting cultural practices, and (3) exercising their religions." (Indian School Report, *supra*, p. 53, fns. omitted.)

Indian schools enforced rules through corporal punishment, solitary confinement, withholding food, and flogging.  (Indian School Report, *supra*, p. 54.)

Some Indian children fled the schools.  Federal officials at the time reported "[t]he children who have run away from school have been promptly brought back and punished, and judicious punishment has in all instances proved very salutary."  The "habit, being of longstanding, was not entirely overcome; but I am convinced that a prompt returning of the runaways and a whipping administered soundly and prayerfully, helps greatly toward bringing about the desired result."  (Indian School Report, *supra*, p. 55, fns. omitted.)

Indian children in the schools experienced rampant overcrowding, disease, malnourishment, and physical, sexual, and emotional abuse.  (Indian School Report, *supra*, p. 56.)

"The United States' creation of the Federal Indian boarding school system was part of a broader policy aimed at acquiring collective territories from Indian Tribes . . . . From the earliest days of the Republic, the United States' official objective—based on Federal and other records—was to sever the cultural and economic connection between Indian Tribes . . . and their territories.  The assimilation of Indian children through the Federal Indian boarding school system was intentional and part of that broader goal of Indian territorial dispossession for the expansion of the United States."  (Indian School Report, *supra*, p. 93.)

"The intentional targeting and removal of American Indian . . . children to achieve the goal of forced assimilation of Indian people was both traumatic and violent.  Based on initial research, the Department [of the Interior] finds that hundreds of Indian

21

children died throughout the Federal Indian boarding school system.  The Department expects that continued investigation will reveal the approximate number of Indian children who died at Federal Indian boarding schools to be in the thousands or tens of thousands.  Many of those children were buried in unmarked or poorly maintained burial sites far from their Indian Tribes . . . and families, often hundreds, or even thousands, of miles away.  The Department's research revealed at least 53 different burial sites across the Federal Indian boarding school system and leads to an expectation that there are many more burial sites that will be identified with further research.  The deaths of Indian children while under the care of the Federal Government, or federally supported institutions, led to the breakup of Indian families and the erosion of Indian Tribes . . . ."  (Indian School Report, *supra*, p. 93.)

Targeting Indian children for assimilation contributed to loss of life, loss of physical and mental health, and loss of territories and wealth.  The policy also contributed to the loss of tribal and family relations and the use of tribal languages.  It eroded tribal religious and cultural practices over many generations.  (*Indian School Report*, *supra*, p. 94.)

"In the final analysis, the boarding school story constitutes yet another deplorable episode in the long and tragic history of Indian-white relations.  For tribal elders who had witnessed the catastrophic developments of the nineteenth century—the bloody warfare, the near-extermination of the bison, the scourge of disease and starvation, the shrinking of the tribal land base, the indignities of reservation life, the invasion of missionaries and white settlers—there seemed to be no end to the cruelties perpetrated by whites.  And after all this, the schools.  After all

22

this, the white man had concluded that the only way to save Indians was to destroy them, that the last great Indian war should be waged against children.  They were coming for the children." (David Wallace Adams, Education for Extinction: American Indians and the Boarding School Experience, 1875–1928 (1995) pp. 336–337.)

The memory of Indian schools is not lost in the past.

United States Secretary of the Interior Deb Haaland recently stated,  "Federal Indian boarding school policies have touched every Indigenous person I know."  (Murphy, *'I will never, ever forgive this school for what they did':  Native American elders share painful memories from government-backed boarding institutions*, (July 11, 2022) L.A Times p. A2.)  "Some are survivors.  Some are descendants.  But we all carry the trauma in our hearts."  (*Ibid.*; see also Becenti, *"I can take this": Former boarding school students tell Haaland about abuse, mistreatment*, Arizona Republic, January 27, 2023, <https://www.azcentral.com/story/news/local/arizona/2023/01/27/deb-haaland-hears-stories-of-mistreatment-at-boardingg-schools/69844003007/> [as of April 12, 2023], archived at < https://perma.cc/35KY-Z3CT>.)

"From the very earliest period in my life that I can remember, there was always a family reunion in August and we always had empty chairs.  I remember as a child I tried to sit in one of the chairs, and my aunts would scold me.  'Don't sit in the chair please, there is someone there.'  And I would ask, 'Mom, there's no one there?' and my mum would say, 'But there is, you just can't see them, we have them in our heart, we have them in our memory, and until the day we find them and we find out where they're at, and we come to help them and bring them

home, we'll put out a chair for them.' " (Carlisle, *supra*, at pp. 352–353.)

## E

The Department's failure prejudices tribes. The Department had contact information for three extended paternal family members but did nothing with it, thus denying tribes the benefit of the statutory promise. It would be a miscarriage of justice to deny tribes the benefit of this legislation.

In light of a long and troubling history, there is no good reason for the Department to fail to ask about Indian ancestry when the cost is slight. When low-cost inquiries yield fruit, the Department can notify the relevant tribes, which can decide whether and how to involve themselves with a child. The information can thereby be a vital link connecting Indian children with their tribes, which helps preserve a future for cultures the Legislature sought to protect. (See *In re K.H.*, *supra*, 84 Cal.App.5th at p. 609.)

Placing this child with maternal family members does not dispel prejudice to tribes. (*In re Oscar H.* (2022) 84 Cal.App.5th 933, 938–940 [portion of opn. not joined by a second justice].) Even in such cases, tribes may assert tribal jurisdiction or may formally intervene in state court. (*Ibid.*)

A "tribe's rights are independent of the rights of other parties." (Tribal Report, *supra*, p. 71.) A parent cannot waive the tribes' rights. (*Ibid.*; *In re Isaiah W.* (2016) 1 Cal.5th 1, 13 [given the protections the Act affords Indian children *and tribes*, parental inaction is not waiver].)

When a relative does not acknowledge a tribe, that relative cannot be expected to carry forward a tribal heritage.

24

The protection of the tribal interest is at the core of ICWA and our state counterpart, which recognize that a tribe has an interest in the child that is distinct from, but on a parity with, the interest of the parents.  This relationship between Indian tribes and Indian children is one many non-Indians find difficult to understand and that *non-Indian courts are slow to recognize*.  (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 52.)

The relevant rights belong to Indian tribes.  They have a statutory right to receive notice where an Indian child may be involved so that they authoritatively may determine for themselves that child's status.  "It necessarily follows that the prejudice to those rights lies in the failure to gather and record the very information the juvenile court needs to ensure accuracy in determining whether further inquiry or notice is required, and whether ICWA does or does not apply." (*In re K.H.*, *supra*, 84 Cal.App.5th at p. 591.)

 The question of membership is determined by the tribes, not by courts or child protective agencies.  (*In re T.G.* (2020) 58 Cal.App.5th 275, 294 [citing *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65, fn. 21 & Welf. & Inst. Code, § 224.2, subd. (h)].)

In sum, the Department's violation of the 2018 amendment is prejudicial.

III

Courts have grappled with the 2018 amendment in the utmost good faith and with pure motives.  All abhor injustices of the past.  All want children like S.S. to achieve stability and finality as soon as possible.  All lament delay and uncertainty that the debate over this amendment has thrust into the lives of

25

these children and the people who love them.  We all share these attitudes and goals.

Courts are united in these respects but disagree about how to apply the 2018 amendment.

Nothing is stopping the Department from taking the slight efforts required to comply with the 2018 amendment.  The sooner the Department begins complying with the law consistently, the sooner this unfortunate and regrettably persistent issue will be resolved.

## DISPOSITION

We conditionally reverse the juvenile court's finding that ICWA does not apply and remand the matter to the juvenile court with directions to order the Department to inquire, if reasonably possible, of the three paternal extended family members previously identified whether S.S. may be an Indian child.  These three paternal relatives are grandfather O.H., aunt L.R., and cousin L.T.  If this inquiry produces information showing ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law.  If, on the basis of these three inquiries, the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated.  In all other respects, we affirm the court's orders terminating parental rights.

WILEY, J.

**VIRAMONTES, J., Concurring**.

I concur with the majority opinion's holdings that the juvenile court erred in finding that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) did not apply and that the error was prejudicial. I also concur in the holding that placement with maternal family relatives does not preclude prejudice to the tribes. I write separately to express my agreement with the analytical framework set forth in *In re K.H.* (2022) 84 Cal.App.5th 566 (*K.H.*) for assessing prejudice when the Los Angeles County Department of Children and Family Services (Department) fails to inquire of extended family members. In this case, the Department's failure to make any inquiry of known paternal extended family members left the juvenile court without sufficient evidence upon which to find that the inquiry was proper, adequate, and duly diligent. As in *K.H.*, this error was prejudicial because "the inquiry fell well short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law." (*Id*. at p. 620.) Remand for an adequate inquiry in the first instance is accordingly required.

VIRAMONTES, J.

1

**STRATTON, P. J., Dissenting**

Mother Karla S. appeals the juvenile court's order terminating parental rights to son S.S. (born May 2021). She does not challenge the juvenile court's decision to terminate her rights. Mother's contention is that the Los Angeles Department of Children and Family Services (DCFS) did not comply with its initial duty of inquiry under Welfare and Institutions Code[1] section 224.2, subdivision (b) in that DCFS failed to ask available extended paternal family members whether S.S. is an "Indian child" within the meaning of section 1903 of the federal Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

DCFS erred in failing to question extended paternal family members despite having contact information for them. However, I conclude the error was harmless because S.S.'s designated prospective adoptive parents are his maternal aunt and uncle.

## BACKGROUND

S.S. was taken into protective custody by DCFS at the time of his birth. Within days thereafter, DCFS filed a section 300 petition alleging Mother had a history of substance abuse and tested positive for opiates at the time of S.S.'s birth; S.S.'s older brother N.S. was already a dependent of the juvenile court due to Mother and Father's neglect and substance abuse; and Father suffered from mental health problems, including suicidal ideation and diagnosed bipolar depression, for which he failed to take his prescribed medication. It was alleged all these circumstances placed S.S. at risk of serious physical and emotional damage. On May 19, 2021, the juvenile court detained infant S.S. from his

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

parents and eventually placed him with his maternal aunt and uncle. The juvenile court ultimately conducted contested separate jurisdictional and dispositional hearings and on September 21, 2021, found S.S. a dependent of the court based on toxicology reports positive for opioids at birth, Mother's drug abuse, and Father's mental illness which had been previously documented in the older son's dependency case.

On February 14, 2022, when S.S. was nine months old, the juvenile court terminated all parental rights in favor of a permanent plan of adoption by his caretaker maternal aunt and uncle, who were designated his prospective adoptive parents.

*ICWA*

As for inquiries into S.S.'s possible Indian ancestry, at the May 19, 2021 detention hearing, Mother submitted ICWA-020 form denying Indian ancestry. However, the juvenile court was informed by minor's counsel (who had spoken to the maternal aunt) that Mother might have Yaqui Native American heritage. DCFS also reported it had interviewed maternal grandmother who believed she had Yaqui ancestry through the maternal great grandfather. The court ordered DCFS to investigate this claim, including by interviewing the maternal aunt and maternal grandmother.

On June 23, 2021, DCFS gave notice to the Pascua Yaqui tribe, which replied by letter dated July 8, 2021 that S.S. was not eligible for membership in the tribe and the tribe would not intervene in the matter. During this time, contact information for a paternal cousin, paternal aunt, and paternal grandfather became known to DCFS. Father also completed an ICWA-020 form stating he was unaware of Indian ancestry. DCFS did not contact any of the family members on the paternal side.

2

On September 21, 2021, the juvenile court found both parents had denied Indian ancestry. The court also found ICWA inapplicable because there was no reason to know S.S. is an Indian Child within the meaning of the statute. Mother's appeal followed.

## DISCUSSION

Mother contends the order terminating parental rights should be reversed because DCFS did not inquire of paternal extended family members about S.S.'s possible Indian ancestry.

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882–883, superseded by statute on other

3

grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147; see 25 C.F.R. § 23.107(a) (2022).)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party

reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b); *In re Dominick D.* (2022) 82 Cal.App.5th 560, 566.)

Here, DCFS did not fulfill its duties under section 224.2 as it did not ask extended paternal family members about Indian ancestry, despite having their contact information. This was a violation of law. But the next question is whether the error was prejudicial. A prerequisite to reversal of a trial court's decision under California law is s showing of a miscarriage of justice. (Cal. Const., art. VI, § 13.)

I find no miscarriage of justice, or, in other words, prejudice. ICWA itself sets out placement priorities. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915(a).) Extended family under ICWA includes aunts and uncles. (25 U.S.C. § 1903(2).) By its terms, the statute does not mandate placement with the Indian side of the family where, as here, one side of the "extended family" is not Indian.

In this case, S.S. was detained immediately after birth and eventually placed with his maternal aunt and uncle. He has remained with them throughout the proceedings. He is now almost two years old, having lived with his aunt and uncle since birth. DCFS reported to the court that S.S. has built a bond with the aunt and uncle as "this is the only family placement he has had." His older brother N.S. is also living with the same caregivers so S.S. has also been able to build what DCFS

5

characterizes as a "lifelong connection to his brother." It is expected these familial bonds will continue to grow because maternal aunt and uncle, with two young daughters of their own who are S.S.'s first cousins, have applied to adopt both brothers.

The prospective adoption by maternal aunt and uncle contrasts with the parents' failure to visit S.S. on a regular basis. They also failed to follow through with telephone contact with S.S. even though calls were scheduled for every Sunday at 11 a.m. Placement with the aunt and uncle has provided S.S. with "regular contact with his extended family members. The maternal grandmother sees the child almost every week, while another maternal aunt lives nearby and is in contact. In addition, the caregivers have contact with paternal aunt who recently spoke to the sibling for his birthday." "The current caregivers' home is adoption ready and there are no impediments to adoption."

The juvenile court implemented ICWA's first preference by designating S.S. adoptable by his maternal aunt and uncle, a logical finding given S.S.'s lifelong placement with them and their close geographic proximity and social connection to extended family members of both Mother and Father. S.S. is in no danger of being separated from his biological family, the evil ICWA was enacted to prevent. (*In re J.W.* (2022) 81 Cal.App.5th 384, 391.) Moreover, even if a tribe had intervened, it would be bound by the placement priorities of the statute if, as the court found here, the first placement priority was in the minor's best interest. Given that the placement chosen by the juvenile court is clearly in S.S.'s best interests and also promotes rather than eviscerates S.S.'s connection to his biological family, I am hard pressed to say that a tribe's inability to participate warrants delaying S.S.'s

permanent unification with, not separation from, his biological family.

I cannot find that ICWA and its California counterpart were intended to elevate a tribe's right to participate over the child's interest in a secure and safe placement within the bosom of the child's biological family. Tribes are included in the proceedings to ensure that no unreasonable and unjustified separation from biological family members occurs. Nothing like that happened here. That the tribe may be the official real party in interest does not supersede the child's best interests, and no one in this proceeding argues that placement within S.S.'s extended family does not serve his best interests. Do we want to unwind this biological-family adoption by the only parents S.S. has ever known so that a tribe can come in and suggest someone else within the first preference category? I do not.

Mother does not argue that her son's proposed adoption by his aunt and uncle is contrary to his best interests or lacks good cause. Nor could she credibly oppose the proposed adoption as the prospective adoptive parents have created a biologically-based family unit which Mother and Father could not do. S.S. has now spent his entire life of two years with the same caregivers who are also part of his own biological family. He is entitled to the security and stability of the adoptive home that is awaiting him, a disposition with which appellant does not quarrel. There is no miscarriage of justice.


STRATTON, P. J.


7